Gabrielli, J.
In the late afternoon of December 30, 1972 the battered and hacked body of Saroj Bardhanabedya was found in appellant’s room on the sixth floor of the Warrington Hotel in New York City. The deceased was a chambermaid in the hotel and had disappeared shortly after reporting for work at about 9:00 a.m. on the morning of her brutal demise. At that time she was observed leaving the elevator on the sixth floor of the hotel, where she had been assigned to clean vacated rooms, but was not seen alive thereafter. Mrs. Peck, a *176 resident of the hotel, began looking for the deceased since the latter had failed to deliver some clean linens to her room as promised. She found Saroj’s street clothes and partially eaten lunch on the sixth floor. Upon reporting to the desk clerk that she could not locate the maid, several residents began searching for her, shouting her name on each floor of the hotel to no avail. Another resident, one Mr. Morrsion, telephoned the police for assistance in locating the maid. Two patrolmen arrived at the hotel and agreed to assist the management in a search for the maid throughout the hotel. Initially, they checked the vacant rooms and then proceeded to knock on doors and inquire of the hotel residents whether they had seen the maid. Eventually, the two patrolmen and Mr. Morrsion reached the room occupied by the defendant. In response to their questions, he stated that he had not seen the missing maid and permitted the police officers to step into his room. After a cursory glance at the surroundings, the officers departed.
At 1:15 p.m. Detective O’Neill of the homicide squad, responding to a missing persons report, arrived at the hotel to assist in the search for Saroj. A thorough but futile investigation was conducted of the hotel basement, roof, air ducts, alleyways and an adjoining restaurant. Then, a room-by-room search of the hotel was commenced. The last room to be searched on the sixth floor was that of the defendant. Detective O’Neill entered the room with a passkey provided by the management and, looking more carefully than his fellow officers had previously, noticed reddish brown stains on the bedding, rug and bathroom wall. Finally, a closet door was opened and two human feet were observed protruding from a laundry basket. Removal of blood soaked linens which had been stuffed into the basket revealed a hatchet and the corpse of the unfortunate chambermaid.
Following the denial of his motion to suppress evidence seized in his hotel room and statements made to the police after his arrest, defendant was convicted of murder and his conviction was unanimously affirmed by the Appellate Division. On this appeal, he claims that the evidence seized in his room should be suppressed because the entry into his room violated the Fourth Amendment of the United States Constitution, having been effected without a warrant and without probable cause that he had committed a crime. Additionally, *177 he argues that the inculpatory statements made to the police should be suppressed, even though voluntarily made after valid preinterrogation admonitions because they were the "poisoned fruits” of the illegal search of his hotel room (cf. People v Martinez, 37 NY2d 662).
The search of defendant’s room was not interdicted by the Fourth Amendment because it was triggered in response to an emergency situation and was not motivated by the intent to apprehend and arrest him or to seize evidence. We have recognized the general obligation of police officers to assist persons whom they reasonably believe to be in distress (People v Gallmon, 19 NY2d 389, 394). Furthermore, State and Federal courts have sanctioned "the right of the police to enter and investigate in an emergency without the accompanying intent to either search or arrest” as "inherent in the very nature of their duties as peace officers” (United States v Barone, 330 F2d 543, 545, cert den 377 US 1004; see, also, Root v Gauper, 438 F2d 361, 364; Wayne v United States, 318 F2d 205, 211-212, cert den 375 US 860; United States v Goldenstein, 456 F2d 1006, 1010; State v Hardin, 90 Nev 10; Patrick v State, 227 A2d 486 [Del]; Peopley Roberts, 47 Cal 2d 374; Davis v State, 236 Md 389; ALI Model Code of Prearraignment Procedure, 1975 Proposed Official Draft, § 260.5, pp 164-165).
Appraising a particular situation to determine whether exigent circumstances justified a warrantless intrusion into a protected area presents difficult problems of evaluation and judgment. This difficulty is highlighted by the fact that Judges, detached from the tension and drama of the moment, must engage in reflection and hindsight in balancing the exigencies of the situation against the rights of the accused. Thus, we think it necessary to articulate some guidelines for the application of the "emergency” doctrine. The basic elements of the exception may be summarized in the following manner:
(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.
(2) The search must not be primarily motivated by intent to arrest and seize evidence.
(3) There must be some reasonable basis, approximating *178 probable cause, to associate the emergency with the area or place to be searched.*
The first requisite is that the police have valid reasons for the belief that an emergency exists, a belief which must be grounded in empirical facts rather than subjective feelings (see Root v Gauper, 438 F2d 361, supra; People v Smith, 7 Cal 3d 282, 287). In the instant case, the maid had not been seen for hours and she had not responded when summoned. It was highly probable that she was somewhere in the hotel and obviously all of the circumstances led to the conclusion that some grave misfortune of an indeterminable nature had befallen the maid.
The second requirement is related to the first in that the protection of human life or property in imminent danger must be the motivation for the search rather than the desire to apprehend a suspect or gather evidence for use in a criminal proceeding. Of course, the possibility that criminal agency could account for the danger may be present. Thus, one commentator has stated that the emergency doctrine includes the right to "promptly launch a criminal investigation involving a substantial threat of imminent danger to either life, health, or property * * * provided * * * they [the police] do not enter with an accompanying intent to either arrest or search” (Mascólo, The Emergency Exception to the Warrant Requirement Under the Fourth Amendment, 22 Buffalo L Rev 419, 426). Detective O’Neill testified at the suppression hearing that he had no reason to believe a crime was being committed in defendant’s room when he entered; the police report of the hotel’s call for assistance stated that a possible kidnapping had taken place. The Judge at the suppression hearing made the express factual finding, affirmed by the Appellate Division that "[a]t the time entry was made into defendant’s room, it was more for the purpose of rendering aid to a possibly ill person than to look for evidence of a crime.” This factual finding is binding upon this court (see People v Robles, 27 NY2d 155, 157; People v Leonti, 18 NY2d 384, 389). The maid’s disappearance was a mystery and it was not known whether she had been stricken with some illness, suffered an accident or possibly fallen victim to a crime. Each of these three alternatives was possible. However, the primary *179 intent in entering defendant’s room and the other rooms in the hotel was to locate the maid and render assistance to her. No criminal investigation had been launched against any individual because it was not known whether a crime had in fact taken place. The primary concern was the health and safety of the maid. Therefore, even if the possibility of the involvement of criminal agency was present in the minds of the searching officers, this contingency was not the primary motivation for the search of appellant’s room.
Finally, the limited privilege afforded to law enforcement officials by the emergency exception does not give them carte blanche to rummage for evidence if they believe a crime has been committed. There must be a direct relationship between the area to be searched and the emergency. In United States v Goldenstein (456 F2d 1006, supra), the police validly entered defendant’s hotel room in search of him under emergency circumstances and upon not finding him there proceeded to search through his belongings. The court suppressed evidence obtained in one of the defendant’s suitcases. In some cases, there are obvious signs which connect the place to be searched with the emergency, for example, screams (United States v Barone, 330 F2d 543, supra), or the odor of a decaying corpse (People v Brooks, 7 Ill App 3d 767). In the instant case, no such apparent clues were found. Rather, an exhaustive search of the public areas of the hotel revealed nothing and pointed to the probability that the maid was in one of the rooms. Furthermore, defendant’s room was the last room on the sixth floor to be searched, the very floor on which the maid was last seen and where her partially eaten lunch was found. If the police were to properly discharge their duty in locating the maid, a search of his room was imperative in light of these facts.
The conclusion is inescapable that the entry and search of defendant’s room were not violative of the Fourth Amendment. We hasten to admonish, however, that this limited privilege to investigate emergencies without a search warrant is subject to judicial scrutiny. In another context, we remarked that reasonableness is the benchmark of the Fourth Amendment proscription against warrantless searches and seizures (People v Martinez, 37 NY2d 662, 670, supra). The reasonableness of police activity must always pass judicial muster according to objective, empirical criteria before the court. We have previously indicated that "[t]he trial courts are *180 familiar with police practices and should be able to determine when an entry is in truth only for investigative purposes based on privileged grounds without any intention to make an arrest” (People v Gallmon, 19 NY2d 389, 394-395, supra).
Constitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum but must yield to paramount concerns for human life and the legitimate need of society to protect and preserve life (see Wayne v United States, 318 F2d 205, 214, supra [opn per Burger, J., concurring]; Patrick v State, 227 A2d 486, 489, supra [Del]). The United States Supreme Court has stated that "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others” (Warden v Hayden, 387 US 294, 298-299).
The People have amply sustained their burden of justifying the warrantless search of defendant’s room (McDonald v United States, 335 US 451, 456; Root v Gauper, 438 F2d 361). Therefore, the evidence obtained was properly admissible at his trial for murder, and, consequently, the defendant’s inculpatory statements were also admissible because they were not the "fruits” of an illegal search. We see no merit to the other contentions advanced.
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Breitel and Judges Jasen, Jones, Wachtler, Fuchsberg and Cooke concur.
Order affirmed.

 (See, e.g., Mascólo, The Emergency Exception to the Warrant Requirement Under the Fourth Amendment, 22 Buffalo L Rev 419, 425-429; Note, The Emergency Doctrine, Civil Search and Seizure, and the Fourth Amendment, 43 Ford L Rev 571, 581-583.)