David GALLMEYER, Appellant,

v.

STATE of Alaska, Appellee.

No. 5081.

Court of Appeals of Alaska.

Feb. 18, 1982.

James L. Bruce, Asst. Public Defender, Ketchikan, and Brian C. Shortell, Public Defender, Anchorage, for appellant.

Michael A. Thompson, Asst. Dist. Atty., Victor C. Krumm, Dist. Atty., Ketchikan, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C. J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

David Harlow Gallmeyer appeals from his conviction of being a felon in possession of a concealable firearm. Prior to conviction, Gallmeyer filed a timely motion to suppress certain evidence, including the gun that he was accused of possessing; he argued that this evidence was obtained by an unlawful search and seizure. The motion was denied by the superior court after an evidentiary hearing, and Gallmeyer subsequently entered a plea of *nolo contendere* to the charge, reserving his right to appeal the suppression issue.[1] The only question raised in this appeal is, thus, the validity of the superior court's ruling on Gallmeyer's motion to suppress.

Since the events leading to Gallmeyer's arrest are crucial to his argument on appeal, it will be appropriate to review the facts established at the suppression hearing below. In so doing, we must accept factual findings specifically made by the superior court, unless clearly erroneous; in the absence of findings as to disputed factual issues, we must view the evidence in the light most favorable to the prevailing party—here the state. *Stumbaugh v. State*, 599 P.2d 166, 172 (Alaska 1979). The evidence in the record, thus construed, is as follows:

On April 12, 1978, David Gallmeyer had a fight with his wife, Linda, at their home in Wrangell, Alaska. The fight apparently began as a dispute over the parentage of the Gallmeyer's fifteen-month-old daughter. David was intoxicated at the time. The fight started out as a verbal dispute, but soon became physical; David hit his wife in the face, either with his fist or with a bottle of liquor, which he threw at her. David ultimately pushed Linda out the front door of their house. Before doing so, he pointed a handgun at his wife and threatened her with it.

After being ejected, Linda Gallmeyer went across the street to a neighbor's house to call the police. She reached Officer Gardner, of the Wrangell Police Department, informed him of the situation, and stated that she wanted police assistance to "confiscate" her fifteen-month-old daughter, who remained in the house with David. Officer Gardner, accompanied by another Wrangell policeman, Officer Wagner, responded to Linda's call, but was delayed when heavy equipment on the highway blocked the most direct route to the Gallmeyer residence and forced the two officers to take a lengthy detour. When the police did not respond to her initial call as quickly as she thought they should have, Linda called again. She spoke once more with Gardner, who was in his patrol car headed toward the Gallmeyer residence; Linda demanded to know what was taking Gardner so long, and she was adamant that she needed police assistance immediately.

After her second call to Gardner, Linda spoke with her husband through the door of their house, from across the street. She told David that she had called the police and that if he would put the baby on the porch, she would not ask the police to enter the house when they arrived. In response to this statement, David put the baby on the front porch of the house. Linda, however, made no attempt to pick the baby up herself. When the police arrived, the infant was still in the immediate vicinity of the porch, although she had apparently managed to toddle down the steps. Upon

---

1. The state stipulated that the suppression issue would be dispositive of the case. We therefore have jurisdiction of the appeal pursuant to *Cooksey v. State*, 524 P.2d 1251 (Alaska 1974), and *Oveson v. Municipality of Anchorage*, 574 P.2d 801, 803 n. 4 (Alaska 1978).

arrival of the patrol car, Linda immediately contacted Officers Gardner and Wagner across the street from her house. She was excited and obviously upset; Gardner recalled that her emotional condition verged on hysteria. Both officers noticed dried blood around Linda's mouth. Linda told the officers that her husband was in the house, intoxicated, that there had been a fight, and that her husband had struck her and pushed her forcibly out of her house. Linda also said that there were numerous guns in the house, and, upon further questioning by Gardner, she disclosed that her husband had threatened her with a handgun before the police arrived.[2] During this conversation, Linda urged the officers to get her baby daughter, who was still near the porch steps, directly in front of the Gallmeyer residence.

Officer Wagner, in plain clothes, then crossed the street and approached the Gallmeyer residence, while Gardner, in uniform, "covered" him with a rifle from across the street. Wagner did not pick up the baby; instead, he walked past her and went up the steps to the porch of the home. At the time, both Wagner and Gardner were concerned about the possibility of being seen and shot at from one of the front windows of the Gallmeyer residence. Wagner specifically testified at the suppression hearing that he did not immediately attempt to pick up the Gallmeyer baby and walk back to her mother because he feared for the safety of the child and for his own safety. Aware of the altercation that had just occurred between David and Linda Gallmeyer, Wagner's paramount concern was that David Gallmeyer was intoxicated and that there were guns readily available to him in the house. Accordingly, Wagner decided to go

to the Gallmeyer residence for the purpose of talking to David Gallmeyer and calming him down.

As Wagner came near the Gallmeyers' porch, he saw someone moving in the house, by the window located in the kitchen area, overlooking the front yard. Wagner walked up the porch steps, calling several times: "Dave" or "David" and "Can I talk with you?" Wagner stopped on the porch when he reached the outer doorway to the home, separated from the inner door by a small patio. About the time that Wagner stopped in front of the outer doorway, David Gallmeyer came toward the inside door, the top half of which was made of glass, allowing Wagner to see David. Wagner then asked David if he could come in to talk, and David made an unintelligible, mumbled response, gave an apparent gesture of acknowledgment with his head, and fumbled with the door latch. Taking David's actions as acquiescence, Wagner entered through the outer door and proceeded to open the inner door himself. As Wagner entered the house, David turned away and began walking towards the kitchen; he appeared to be intoxicated. Wagner immediately noticed a gun tucked in the waistband of David's trousers, in the small of his back. He then reached out and removed the gun from David's waist. Thereafter, David grabbed for another gun from atop the refrigerator, and a scuffle ensued during which a gun went off. No one was injured. David was quickly subdued and arrested for possession of firearm while intoxicated.

It is undisputed that, before placing David Gallmeyer under arrest, Wagner had no knowledge of his prior felony record; nor did Wagner think that he had probable cause to enter the Gallmeyer home to place

---

2. At the suppression hearing below, Linda Gallmeyer denied telling the officers that David Gallmeyer had threatened her with a gun. She did acknowledge telling the officers that David Gallmeyer "might have" a gun in his possession. However, the court generally found Linda Gallmeyer's testimony to be suspect, and apparently gave it little weight. It is undisputed, though, that only Officer Gardner heard any specific statement by Linda Gallmeyer about having been threatened with a gun before being

evicted from her home. Officer Wagner testified that, after hearing Mrs. Gallmeyer state that there had been a fight, that her husband was intoxicated and that there were numerous weapons in the house, he became concerned about the potential danger of the situation, and his attention focused on the house and the Gallmeyer baby; Officer Wagner thus did not hear Mrs. Gallmeyer's statement that David Gallmeyer had threatened her with a gun in the course of their dispute.

David under arrest. It was only when subsequent investigation showed that Gallmeyer had a prior felony conviction that he was indicted for being a felon in possession of a firearm, in violation of former AS 11.55.030.

In denying Gallmeyer's motion to suppress, superior court Judge Thomas Schulz specifically found that Wagner's entry into the Gallmeyer residence was not consensual.[3] However, Judge Schulz reasoned that Wagner's entry was not undertaken for the purpose of arresting Gallmeyer or conducting a search. The judge found that the entry was solely investigative in nature and was meant to assure the safety of the officer and the Gallmeyers' baby. Judge Schulz ultimately denied the motion to suppress, concluding that "the police officer's conduct was reasonable under the circumstances."

On appeal, the state refrains from arguing that the police conduct in this case should be evaluated on the basis of whether it was reasonable under the circumstances.[4] Instead, the state contends that Officer Wagner's entry to the Gallmeyer residence was justified under the emergency aid exception to the warrant requirement. The state argues that, although the superior court did not base its decision on this ground, it made sufficient findings to enable this court to rely on the emergency aid doctrine. Gallmeyer counters by arguing that the facts in the record fail to establish

the existence of an emergency that could reasonably have justified a warrantless entry of his residence. We have concluded that the state's position is well taken.

▮▮▮ The starting point for our analysis must, of course, be the basic rule that warrantless entries are deemed *per se* unreasonable and may be tolerated only if they fall within one of the well-established and specifically defined exceptions to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576, 585 (1967); *Erickson v. State*, 507 P.2d 508, 514 (Alaska 1973). The burden below was on the state to prove by a preponderance of the evidence that Officer Wagner's conduct fell within a recognized exception. *Schraff v. State*, 544 P.2d 834, 838 (Alaska 1975).

The emergency aid doctrine has been uniformly recognized as an exception to the warrant requirement.[5] Perhaps the most commonly cited statement of the doctrine is found in *United States v. Barone*, 330 F.2d 543, 545 (2nd Cir. 1964), *cert. denied* 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053 (1964), where the court said:

> The right of the police to enter and investigate in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their duties as police officers, and derives from the common law.[6]

---

**3.** This finding has not been disputed by the state on appeal, since the record fails to disclose that Gallmeyer knowingly, intelligently and unequivocally indicated his consent to Wagner's entry. *See, e.g., State v. Myers*, 601 P.2d 239, 241 n. 4 (Alaska 1979).

**4.** Such an argument would, of course, be problematical in light of the warrant requirements of the fourth amendment to the United States Constitution and article I, section 14, of the Alaska Constitution. *See G. R. v. State*, 638 P.2d 191, 196 (Alaska App., 1981).

**5.** *See generally* 2 W. LaFave, Search & Seizure § 6.6(a) (1978); Mascolo, The Emergency Doctrine Exception To The Warrant Requirement Under The Fourth Amendment, 22 Buff.L.Rev. 419 (1973). Although the United States Supreme Court has not yet squarely applied the exception, a number of its holdings have given it at least implicit recognition. *See, e.g., Min-*

*cey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978); *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

**6.** *See also Wayne v. United States*, 318 F.2d 205, 212 (D.C.Cir.1963) *cert. denied*, 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963), another frequently cited case, where Chief Justice (then Judge) Burger, concurring, wrote:

> A warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency .... A myriad of circumstances could fall within the terms 'exigent circumstances' ..., e.g., smoke coming

The emergency aid doctrine has been given express recognition by the Alaska Supreme Court, *Schraff v. State*, 544 P.2d at 840–41, and it was first applied by the court in 1968. *Stevens v. State*, 443 P.2d 600, 602 (Alaska 1968).[7]

A concise summary of the elements necessary to justify a warrantless entry under the emergency aid doctrine was recently set forth in *People v. Mitchell*, 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607, 609 (N.Y.1976), *cert. denied* 426 U.S. 953, 96 S.Ct. 3178, 49 L.Ed.2d 1191 (1976); there, the New York Court of Appeals identified three separate requirements:

(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

(2) The search must not be primarily motivated by intent to arrest and seize evidence.

(3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.[8]

In assessing the circumstances of a particular case in light of these requirements, several important factors must be considered. As to the first requirement, it is well settled that the existence of an emergency must be determined by an objective standard— whether the evidence would have led a prudent and reasonable officer to perceive an immediate need to take action in order to prevent death or to protect against serious injury to persons or property. 2 W. LaFave, Search & Seizure § 6.6(a) at 648 (1978). *See also Stevens v. State*, 443 P.2d at 602; *People v. Mitchell*, 383 N.Y.S.2d at 249–250, 347 N.E.2d at 611; *State v. McCleary*, 116 Ariz. 244, 568 P.2d 1142 (Ariz.App.1977).[9] The second requirement takes account of the fact that the emergency aid exception must not be permitted to act as a subterfuge, allowing officers to search for evidence of crime in areas to which they would otherwise have no access in the absence of a warrant. Accordingly, a high level of judicial scrutiny is focused on the actual intent of officers invoking the exception, and the exception has been held not to apply where an officer was motivated by a desire to search for evidence of criminal misconduct, rather than by a genuine intent to render assistance. *See, e.g., Schraff v. State*, 544 P.2d at 841–42; *People v. Mitchell*, 383 N.Y.S.2d at 249–250, 347 N.E.2d at 611.[10] Finally, with regard to the third requirement, it must be clear from the circumstances that any warrantless search conducted under the emergency aid doctrine is restricted in time and scope to the nature and duration of the particular emergency. In other words, "[t]here must be a

out a window or under a door, the sound of gunfire in the house, threats from the inside to shoot through the door at police, reasonable grounds to believe an injured or seriously ill person is being held within.

7. For a more recent Alaska Supreme Court case apparently applying the emergency aid exception, *see Schultz v. State*, 593 P.2d 640 (Alaska 1979), where the court upheld the warrantless entry of a burning home by a fire inspector searching for the cause of the blaze. The court in Schultz stated:

The narrowly defined classes of cases which justify invasion of privacy without a warrant are these instances where there is a 'compelling need for official action and no time to secure a warrant.'

*Id.* at 642 (footnote omitted) (citing *Michigan v. Tyler*, 436 U.S. at 509, 98 S.Ct. at 1949–1950, 56 L.Ed.2d at 498).

*See also State v. Myers*, 601 P.2d 239, 245 (Alaska 1979) (Rabinowitz, C. J., concurring).

8. *Compare* the standard enunciated in *People v. Mitchell with* the ALI Model Code of Prearraignment Procedure, § 260.5 (Proposed Official Draft, 1975). *See also* 2 W. LaFave, Search & Seizure § 6.5(d) (1978).

9. *See also Patrick v. State*, 227 A.2d 486, 489 (Del.1967), cited with approval in *Stevens v. State*, 443 P.2d at 602.

10. As stated in *People v. Mitchell*, 383 N.Y.S.2d at 249, 347 N.E.2d at 610:

The second requirement is related to the first in that the protection of human life or property in imminent danger must be the motivation for the search rather than the desire to apprehend a suspect or gather evidence for use in a criminal proceeding. Of course, the possibility that criminal agency could account for the danger may be present.

direct relationship to the area to be searched and the emergency," *People v. Mitchell*, 383 N.Y.S.2d at 249, 347 N.E.2d at 610, and the search may not be initiated after it is manifest that the emergency has ceased to exist. *Mincey v. Arizona*, 433 U.S. at 392, 98 S.Ct. at 2413, 57 L.Ed.2d at 300.[11]

In the present case, we must evaluate the conduct of Officer Wagner in light of the three-fold standard of *People v. Mitchell*, bearing in mind the considerations discussed above; on this basis, we must decide whether the elements of the emergency aid exception have been established. As to the first facet of the *Mitchell* test, Gallmeyer argues:

> There was no 'compelling urgency,' no risk of death if the police did not act immediately, no imminent threat to life or limb. Mr. Gallmeyer had made no threats, fired no shots. He was alone in the house. His wife was safely outside, his daughter sitting in the yard outside the house. There was no reason to suspect that he would harm his daughter or anyone who approached the house.

However, this view of the evidence ignores the realities of the situation with which Officers Wagner and Gardner were objectively confronted. When the evidence is viewed in the light most favorable to the state, we think it apparent that both Officers Wagner and Gardner had ample cause to fear that David Gallmeyer posed an immediate threat of inflicting serious and potentially fatal injury upon his daughter or third persons attempting to intervene by rescuing his daughter.

Here, two calls were made to the police. After Linda Gallmeyer's initial call indicating that she had been assaulted and pushed from her residence by her intoxicated husband, the officers received a second call from her, in which she stressed her need for immediate police assistance. This second call could only have served to impress upon the two officers Linda Gallmeyer's personal assessment of the urgency and seriousness of the situation. Moreover, upon arriving at the scene, both officers observed Linda Gallmeyer to be excited and upset. Linda told both officers that her husband was intoxicated, that he had struck her and forcibly evicted her from her home; both officers observed blood on Linda's face, confirming her husband's willingness to resort to violence. Linda further told both officers that there were numerous firearms in the house. Officer Gardner was also specifically informed that David Gallmeyer had threatened his wife with a handgun before evicting her. But perhaps the most compelling indication of imminent danger was that Linda Gallmeyer had made no attempt to rescue her own child after the child had been put down on the porch. Rather, she awaited the arrival of the officers. In objective terms, Linda's apparent fear of rescuing her own daughter is a forceful indicator of the extent of danger perceived as existing.

It was in this context that Officers Wagner and Gardner were asked for their assistance in rescuing Linda Gallmeyer's child. When Mrs. Gallmeyer's apparent concern for her child's safety and her apparent fear of trying to rescue the child herself are viewed in conjunction with the information which she had related to the officers and their own observations, it seems apparent to us that both officers were reasonably entitled to conclude that a potentially life threatening situation existed, calling for their immediate intervention to assure the safety of the Gallmeyer baby. We thus hold that the first requirement of the emergency aid doctrine—the existence of an emergency—has been satisfied in the present case.

In reaching this conclusion, we are not unmindful that " 'emergency aid' ordinarily requires true necessity—that is, an imminent and substantial threat to life, health or property." Moscolo, The Emergency Doctrine Exception To The Warrant Requirement Under The Fourth Amendment, 22 Buff.L.Rev. 419, 434 (1973) (citations omit-

---

11. *Compare Mincey v. Arizona with LaFournier v. State*, 91 Wis.2d 61, 280 N.W.2d 746, 749–50 (1979), *and Stevens v. State*, 443 P.2d at 602.

ted). But "true necessity" has never been construed to require absolute proof that injury would necessarily have occurred. *Compare* the circumstances of this case with *West v. State*, 617 P.2d 1362 (Okl.Cr. App.1980); *State v. Super*, 37 Or.App. 731, 588 P.2d 106 (1978); *and State v. McCleary*, 116 Ariz. 244, 568 P.2d 1142 (Ariz.App.1977). Rather, in determining necessity, the probability and potential seriousness of the threatened harm must be viewed objectively and balanced against the extent to which police conduct results in a violation of privacy interests. As stated in *Patrick v. State*, 227 A.2d 486, 489 (Del.1967):

> [T]he criterion is the reasonableness of the belief of the police as to the existence of an emergency, not the existence of an emergency in fact.

With respect to the second element of the emergency aid doctrine—the requirement that the officer be primarily motivated by the emergency, and not by a desire to arrest a suspect or seize evidence of a crime—we believe the superior court's findings to be conclusive. After considering the evidence presented at the suppression hearing below, Judge Schulz concluded that Officer Wagner's sole purpose in seeking to contact David Gallmeyer was the desire to investigate the potential for danger and to assure that no injury would be suffered, either by himself or by the child, by trying to calm David down. The superior court's findings on this issue are amply supported by the evidence, and we agree with the conclusion reached by Judge Schulz that Wagner's entry into the Gallmeyer home was not motivated by a desire to arrest David Gallmeyer or to search for incriminating evidence.[12]

We must decide, finally, whether the third requirement of the emergency aid doctrine has been met. Our analysis must turn to the issue whether Wagner's war-rantless entry of the Gallmeyer residence was justified in light of the emergency—whether there was a direct relationship between the threat posed by David Gallmeyer and Officer Wagner's warrantless entry into Gallmeyer's home.

In our view, the record supports the conclusion that Officer Wagner was justified in believing that, if he had simply picked up the child and attempted to carry her back to Linda Gallmeyer, he would have done so at tremendous risk to his own safety and the safety of the child. Given this conclusion, it follows that his decision that it was necessary to contact David Gallmeyer and calm him down was a sound one. Gallmeyer, however, points out that as Wagner walked past the child and approached the home, Officer Gardner called out a warning, advising Wagner not to enter the home. Gallmeyer argues from this that Gardner did not believe an emergency existed. We think it more plausible, however, that Gardner's warning, the intent of which was never explored at the evidentiary hearing below, was no more than an expression of his own belief that less risk would be involved in attempting to carry the baby directly back to her mother, rather than in trying to make contact with David Gallmeyer first. Nothing in the record supports the conclusion that Gardner believed there was no cause for alarm, and certainly the fact that he was "covering" Wagner with a rifle compels a contrary conclusion. Furthermore, there is nothing in the record to show that Gardner was in a better position than Wagner to make a strategic determination as to how the situation could best be handled. To the contrary, it was Officer Wagner who was taking the greater risk, and his proximity to the Gallmeyer residence afforded him a better chance to

---

12. Gallmeyer has separately argued that all evidence seized as a result of Officer Wagner's entry into his home should be suppressed because of the officer's failure to comply with Alaska's knock-and-announce statutes, AS 12.-25.030 and 12.25.100. Gallmeyer maintains that Wagner never announced his identity or purpose for entering. The knock-and-announce provisions of the Alaska Statutes, by their own terms, apply only to officers seeking to enter premises to serve a warrant or make an arrest. Because it was specifically determined that Wagner did not enter Gallmeyer's home either to arrest him or to conduct a search of the premises, AS 12.25.030 and 12.-25.100 are inapplicable, and Gallmeyer's argument is without merit.

decide whether to take the risk of picking up the Gallmeyer child and carrying her away, or whether to seek contact with the child's father.

■ Even if, under the circumstances, it would have been reasonable for Wagner to attempt to carry the child directly back to Linda Gallmeyer, Wagner's decision to contact David Gallmeyer instead does not thereby become an unreasonable one. As our supreme court stated in *State v. Myers*, 601 P.2d at 245: "The existence of one reasonable course of action does not render all alternative courses unreasonable."

As we have previously pointed out, close judicial scrutiny must be given to assure that any claim of emergency aid is real and that police assistance is not a pretext to search for evidence of a crime. But once the existence of an emergency has been determined, and once it has been found that an officer's conduct was motivated by the apparent need to render assistance, courts and commentators alike have agreed that officers must be allowed a broad scope of judgment in the precise manner of dealing with emergency situations. *See, e.g., State v. Monroe*, 101 Idaho 251, 611 P.2d 1036 (1980); *State v. Jones*, 45 Or.App. 617, 608 P.2d 1220 (1980). As held in *State v. Jones*, 608 P.2d at 1222:

> [A]n officer's action [in entering a premises under the emergency aid doctrine] should not be reviewed with severe judicial scrutiny in light of a hindsight analysis of the evidence.

A similar view is voiced by LaFave:

> [The requirement that an officer have probable cause before making a warrantless entry under the emergency aid doctrine] must be applied by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences.

2 W. LaFave, Search & Seizure § 6.6(a) at 468 (1978).[13] We thus conclude that Officer Wagner's decision to contact David Gallmeyer before attempting to pick up the Gallmeyer baby was a reasonable and direct effort to deal with the threat of danger existing at the time, and that his entry of the Gallmeyer residence to establish this contact was permissible.

■ Gallmeyer separately maintains, however, that the emergency aid doctrine cannot apply to his case because his child had been placed outside the house and no further emergency existed. In support of this assertion, Gallmeyer cites *Mincey v. Arizona*, 437 U.S. at 392, 98 S.Ct. at 2413, 57 L.Ed.2d at 300, and *Root v. Gauper*, 438 F.2d 361 (8th Cir. 1971). Both of these cases refused to apply the emergency aid doctrine under circumstances where it appeared that the original emergency no longer existed when the police entry was initiated.

We believe that the similarity between the circumstances of *Mincey* and *Root* and those of the present case are minimal indeed. Once the child had been placed on the porch, all danger did not cease in this case. Given the circumstances known to the officers, the continued potential for violent injury was apparent. For Officer Wagner to have disregarded this potential by picking the child up immediately would have amounted to a breach of his duty as an officer to protect the child's safety.

---

13. *See also* the following comments, made by Chief Justice (then Judge) Burger in *Wayne v. United States*, 318 F.2d 205, 212 (D.C.Cir.1963) cert. denied 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963) (emphasis in original):

> [T]he business of policemen and firemen is to *act*, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process.

We believe that situations such as the present one, where officers are called upon to intervene in episodes of domestic violence, are often particularly hazardous. In such cases a tremendous amount of emotion can be involved, tempers are frequently strained, and irrational and unanticipated violence is not uncommon. Thus, when officers responding to a call involving domestic violence encounter objective factors sufficient to indicate an imminent danger of death or serious injury to life or property, it is particularly appropriate for courts to be flexible in assessing the reasonableness of the particular manner chosen to deal with the emergency.

In effect, Gallmeyer's claim seems to be that the emergency aid doctrine should not apply unless the person in need of assistance is located on the premises entered. Typically, emergency aid cases do involve an injured person or a victim who is located inside the premises entered. *See, e.g., Commonwealth v. Kingsbury*, 7 Mass.App. 51, 385 N.E.2d 1020 (1979) *aff'd*, 378 Mass. 751, 393 N.E.2d 391, 392 (1979); *La Fournier v. State*, 91 Wis.2d 61, 280 N.W.2d 746 (1979); *People v. Mitchell*, 39 N.Y.2d 173, 383 N.Y. S.2d 246, 347 N.E.2d 607 (1976), *cert. denied* 426 U.S. 953, 96 S.Ct. 3178, 49 L.Ed.2d 1191 (1976). However, this is by no means true of all cases involving the emergency aid doctrine. In *Long v. State*, 310 So.2d 35, 36 (Fla.App.1975), the court specifically rejected an argument that the emergency aid doctrine should be restricted to warrantless entries of premises in which the person requiring assistance was located, finding no logical justification for such a restriction.[14]

Numerous cases from other jurisdictions have been decided in which application of the emergency aid doctrine, under circumstances reasonably similar to those of the present case, has been approved to justify the warrantless entry of a home or building by officers seeking to protect persons located outside the premises. *See, e.g., United States v. Moskow*, 588 F.2d 882 (3rd Cir. 1978); *State v. McCleary*, 116 Ariz. 244, 568 P.2d 1142 (Ariz.App.1977); *United States v. Dunavan*, 485 F.2d 201 (6th Cir. 1973); *West v. State*, 617 P.2d 1362 (Okl.Cr.App. 1980); *State v. Super*, 37 Or.App. 731, 588 P.2d 106 (1978); *State v. Gallo*, 20 Wash. App. 717, 582 P.2d 558 (1978); and *United States v. Rodriguez*, 503 F.Supp. 15 (D.P.R. 1980).

 Having reviewed the record in this case, we are convinced that Officer Wagner's conduct falls within the requirements of the emergency aid exception to the warrant requirement.[15] Accordingly, David Gallmeyer's conviction is AFFIRMED.

---

**14.** *Accord*, 2 W. LaFave, Search & Seizure § 6.6(a) at 472 (1978) ("Entry may be justified even though the endangered persons are not in the premises . . . .")

**15.** Although the superior court, in denying Gallmeyer's motion to suppress, did not expressly rely on the emergency aid doctrine, but, instead, articulated its decision in terms of the general reasonableness of the police conduct, we believe that application of the emergency aid exception to this case is entirely consistent with the superior court's ruling. In announcing his findings of fact and conclusions of law after the suppression hearing, Judge Schulz stated, at one point:

> Prudence, I think, dictated that the officer check the situation out a little bit more before he picked up this young child. If he guessed wrong and gunfire ensued, it wasn't just the officer that was in jeopardy, that kid was. And I think he was under an obligation to check it out . . . .

The judge reiterated this statement at a later point:

> As I have indicated before, I think that officer had an affirmative obligation to check out the situation and determine that that youngster could be removed without any harm to either the officer or the youngster before he just picked it up . . . .

These comments illustrate the superior court's recognition of the fundamental policy supporting the emergency aid doctrine: the need to assure effective and immediate police action in the face of and imminent threat of death or serious injury to persons or property.