**Robert Duane GIBSON III, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–9720.

Court of Appeals of Alaska.

April 10, 2009.

---

Sharon Barr, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant.

W.H. Hawley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## *OPINION*

COATS, Chief Judge.

Robert Duane Gibson III was convicted of two counts of misconduct involving a controlled substance in the second degree,[1] one count of misconduct involving a controlled substance in the fourth degree,[2] and one count of disorderly conduct.[3] Gibson appeals, arguing that Superior Court Judge Michael L. Wolverton erred in denying his motion to suppress evidence. Gibson's motion to suppress was based on his claim that the police discovered the evidence of his drug offenses by illegally entering his trailer without a warrant. The State argued that the police were authorized to enter Gibson's trailer under the emergency aid exception to the warrant requirement. Judge Wolverton found that the police entry was justified under the emergency aid exception and denied Gibson's motion to suppress. We reverse Judge Wolverton's decision because we conclude that the circumstances surrounding the search, as established at the evidentiary hearing, would not "have led a prudent and reasonable officer to perceive an immediate need to take action in order to prevent death or to protect against serious injury to persons or property."[4]

*Factual and procedural background*

On July 10, 2002, a woman called 911 to report a domestic disturbance. The 911 operator entered the text, "Female stated male was threatening to stab her in the head. Could hear 11–19 [disturbance] in background," which was then transmitted. Anchorage Police Officers Justin Doll and Francis Stanfield were dispatched to the source of the call, a trailer on Eureka Street. Upon arriving, Officers Doll and Stanfield heard a woman screaming in the trailer. Moments later, Lisa Bevin "tumbled out of the door" of the trailer wearing only a tank top. Officer Stanfield noticed that Bevin had a "cut on the back of her head that was bleeding" and her eye was swollen. Bevin saw the officers and said, "Help me, help me."

As the officers tried to talk to Bevin, Gibson appeared in the doorway and then started to go back inside. Officer Doll testified that because he did not know "who these people were, how they were involved in the call ... [and] we didn't really have control of [the situation] at that point," he called for backup. The officers drew their weapons and ordered Gibson to come out of the trailer. Gibson complied, and the officers took him into custody outside the trailer. Gibson offered no resistance and was cooperative. Officer Stanfield handcuffed Gibson and placed him in the back of his patrol car.

While the police were dealing with Gibson, Bevin went back into the trailer and put on a

---

**1.** AS 11.71.020(a)(2), (4).

**2.** AS 11.71.040(a)(5).

**3.** AS 11.61.110.

**4.** *Gallmeyer v. State,* 640 P.2d 837, 842 (Alaska App.1982).

pair of pants. The police asked her to come out of the trailer. She asked for permission to put on some shoes, and the police agreed. She then came out of the trailer.

The police attempted to talk to Bevin, but Bevin was upset and "screaming and crying and carrying on" to such an extent that Officer Stanfield put her in the back of a patrol car. Bevin told Officer Doll that there was no one else in the trailer. Officer Doll testified that he did not know if Bevin was the person who had made the 911 call, but there is no indication that he asked Bevin whether she had made the call.

Once Bevin and Gibson were under control, Officer Doll contacted the officer who was responding as backup to let him know that he could proceed to the trailer without his lights and siren, because a suspect was already in custody. Officer Doll testified that during that time, they "saw nothing else that would indicate that there was another person inside [the trailer]."

Once the backup officer arrived, he supervised Gibson and Bevin while Officers Stanfield and Doll entered the trailer to search for anyone who might be injured. Officer Doll explained that, although Bevin had told him that there was no one else in the trailer, people had lied to him in the past, and he needed to make sure there was no one still inside the trailer who had been injured in some way. When they entered the trailer, the officers discovered a methamphetamine laboratory. The police later obtained a warrant, reentered the trailer, and gathered evidence of the illegal drug activity.

The State charged Gibson with two counts of misconduct involving a controlled substance in the second degree for manufacturing methamphetamine, and for possessing the precursors of methamphetamine with the intent to manufacture it. The State also charged Gibson with misconduct involving a controlled substance in the fourth degree for maintaining a dwelling used for keeping or distributing controlled substances, and with

assault in the fourth degree for his alleged assault on Lisa Bevin.

Gibson filed a motion to suppress. In that motion, he argued that the police had discovered the evidence of the methamphetamine laboratory when they illegally entered his trailer without a warrant. The State argued that the police were authorized to enter his trailer based upon the emergency aid exception to the warrant requirement.

Following evidentiary hearings, Judge Wolverton denied Gibson's motion to suppress. Judge Wolverton found that "the officers did not act unreasonably in not relying on Bevin's claim that no one else was in the trailer when they entered the trailer to make sure that no one else was injured or in need of medical assistance."

A jury convicted Gibson on two counts of misconduct involving a controlled substance in the second degree and one count of misconduct involving a controlled substance in the fourth degree. The jury also convicted Gibson of disorderly conduct, a lesser-included offense of assault in the fourth degree. Gibson appeals.

*Why we conclude that warrantless entry into Gibson's trailer was not justified by the emergency aid exception*

We discussed the emergency aid exception to the warrant requirement in *Gallmeyer v. State*.[5] In *Gallmeyer*, the defendant appealed his conviction for being a felon in possession of a concealable firearm.[6] He argued that the police obtained the firearm by illegally entering his home.[7]

The case arose from a domestic dispute in which David Gallmeyer hit his wife, Linda, in the face, pointed a gun at her, and pushed her out of their house.[8] Linda fled across the street and called the police from a neighbor's house. She informed Gallmeyer that she had called the police and told him that if he put their baby on the porch, she would not ask the police to enter the house when they

---

**5.** 640 P.2d 837.

**6.** *Id.* at 839.

**7.** *Id.*

**8.** *Id.*

arrived.[9] In response, Gallmeyer put the baby on the front porch.[10]

After the police arrived, Linda told them that her husband was intoxicated and that he had struck her, threatened her with a gun, and ejected her from the house.[11] She also disclosed that there were "numerous" guns in the house.[12] Linda urged the police to bring her daughter to her.[13] Based on Gallmeyer's violent and intoxicated state and the fact that he both possessed guns and had recently made threats with them, the police officers feared for their own safety and that of the child.[14] They decided the safest course of action would be to try to calm Gallmeyer down before attempting to pick up the baby.[15] A police officer testified that he did not attempt to pick up the baby because he thought this would not be safe for either him or the child.[16] When the officer got to the house, he talked to Gallmeyer, who was inside the home. The officer ultimately entered the house, pulled a gun from Gallmeyer's waistband, and struggled with him as he reached for another gun, which went off.[17] No one was injured. Gallmeyer was arrested.[18]

We upheld the trial court's ruling denying Gallmeyer's motion to suppress. We first set out "the basic rule that warrantless entries are deemed per se unreasonable and may be tolerated only if they fall within one of the well-established and specifically defined exceptions to the warrant requirement."[19] We then went on to discuss the emergency aid exception to the warrant requirement.[20] We

adopted and applied the three-part test articulated by the New York Court of Appeals in *People v. Mitchell*:[21]

(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

(2) The search must not be primarily motivated by intent to arrest and seize evidence.

(3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.[22]

In concluding that the emergency aid exception had been satisfied in Gallmeyer's case, we observed that the emergency aid doctrine "ordinarily requires true necessity— that is, an immediate and substantial threat to life, health, or property."[23] We went on to observe:

"[T]rue necessity" has never been construed to require absolute proof that injury would necessarily have occurred.... Rather, in determining necessity, the probability and potential seriousness of the threatened harm must be viewed objectively and balanced against the extent to which police conduct results in a violation of privacy interests.[24]

Applying this test to Gallmeyer's case, we concluded that the officers' "decision to contact David Gallmeyer before attempting to pick up the Gallmeyer baby was a reasonable

---

9. *Id.*

10. *Id.*

11. *Id.* at 840.

12. *Id.*

13. *Id.*

14. *Id.*

15. *Id.*

16. *Id.*

17. *Id.*

18. *Id.*

19. *Id.* at 841.

20. *Id.*

21. 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607 (1976). The second prong of this test has been abrogated under federal law by *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404, 126 S.Ct. 1943, 1947, 164 L.Ed.2d 650 (2006).

22. *Id.* at 609, *quoted in Gallmeyer*, 640 P.2d at 842.

23. *Gallmeyer*, 640 P.2d at 843 (quoting Edward G. Mascolo, *The Emergency Doctrine Exception to the Warrant Requirement Under the Fourth Amendment*, 22 Buff L.Rev. 419, 434 (1973)).

24. *Id.* at 844.

and direct effort to deal with the threat of danger existing at the time, and that [the officer's] entry of the Gallmeyer residence to establish this contact was permissible." [25]

Applying the *Gallmeyer* standard to Gibson's case, we conclude that the State did not present sufficient evidence to justify entering Gibson's home without a warrant. The *Gallmeyer* test requires us to give substantial weight to a citizen's right to privacy in his home. In order to enter a home based upon the emergency aid exception, we believe that the State must show "true necessity—that is, an imminent and substantial threat to life, health, or property." [26] In addition, although *Gallmeyer* emphasizes that a showing of necessity does not "require absolute proof that injury would necessarily have occurred," this test implies that a mere possibility that an emergency exists will ordinarily not be sufficient.[27]

The State justifies the police entry into Gibson's home based on speculation. The State's case rests on the contention that the officers did not know whether Bevin was the person who made the 911 call, that the police were responding to a serious assault which apparently involved a knife, that Bevin was hysterical and uncooperative, and the police could not rely on her statement that there was no one else in the trailer. But the facts known to the officers at the time they entered the trailer strongly support the conclusion that Bevin was the person who made the 911 call. Bevin's injuries were consistent with the threat that the caller reported, but the police never asked Bevin whether she was the person who made the call. Perhaps this was because Bevin was uncooperative or because the officers were not willing to credit Bevin's statements given the emotionally charged nature of the situation. At the time the police entered the trailer, there was no sign that there was anyone inside, and the police had both Gibson and Bevin in custody. At this point, the police had no reason to believe that there was anyone else in the trailer.

Our concern is that, if we were to authorize the police to enter someone's home based on these facts, the police would routinely be able to search a residence in most cases where there was a report of a serious domestic dispute. We conclude that, under the circumstances of Gibson's case, the emergency aid exception to the warrant requirement did not justify the police entry into Gibson's home. Although it is understandable that the police wanted to eliminate even the most remote possibility that there was an additional victim in the home, the scant evidence supporting that possibility in Gibson's case was not sufficient to override the important constitutional requirement that the police have a warrant to enter a home.

### Conclusion

We hold that the police unlawfully entered Gibson's trailer following his arrest. We do not address the questions of what evidence should be suppressed as a result of this illegal search, or whether the indictment should be dismissed. The trial court has not had the opportunity to decide these issues. Accordingly, we REVERSE the decision of the trial court and REMAND for further proceedings consistent with this opinion.

---

**25.** *Id.* at 845.

**26.** *Id.* at 843 (quoting Edward G. Mascolo, *The Emergency Doctrine Exception to the Warrant Requirement Under the Fourth Amendment,* 22 BUFF. L.REV. 419, 434 (1973)).

**27.** *Id.* at 844.