■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JASSAN J., Appellant. [923 NYS2d 102]—

Judgment, Supreme Court, New York County (Michael R. Ambrecht, J.), rendered September 23, 2008, convicting defendant, upon his plea of guilty, of criminal possession of a controlled substance in the third degree, adjudicating him a youthful offender, and sentencing him to a term of five years' probation, affirmed.

The court properly denied defendant's suppression motion. There is no basis for disturbing the court's credibility determinations, which are supported by the record (see People v Prochilo, 41 NY2d 759, 761 [1977]). Although we agree with defendant that he had standing to challenge the search, we find that the People established, by clear and convincing evidence, that the police entered the apartment and found contraband only after obtaining the voluntary consent of the apartment's tenant (see People v Gonzalez, 39 NY2d 122, 128-131 [1976]). The officer, who was responding to a 911 call that had been placed from the apartment but that the tenant denied making, expressly requested permission to look through the apartment to see if anyone else was present. There was no evidence of coercion, and the police acted within the scope of the consent when they then entered a bedroom and found drug paraphernalia in plain view (see People v McClain, 61 AD3d 416 [2009], lv denied 13 NY3d 747 [2009]).

Regardless of consent, we also find that the credible evidence establishes that the search which led to the discovery of the drugs was the result of proper police work necessitated by exigent circumstances. At the suppression hearing Officer Gregory Encarnacion testified that he and his partner, Officer Fillette, received a radio run of a 911 call for help coming from the subject apartment. The nature of the radio run was vague, as the caller had not said anything, but had merely called and hung up after around 20 seconds of silence. According to Encarnacion, such calls could be a harbinger of "anything," and were to be treated "very seriously."

The two officers went to the apartment, knocked, and announced themselves as police. When no one answered, the officers knocked again, but still no one answered.

Since they had not received any answer at the door, Encarnacion decided to go outside to see whether he could see into the apartment from the window. As he went outside, he saw someone running from the direction of the apartment window. Encarnacion went back to the apartment and reported to Officer Fillette what he had seen. He then knocked on the door again, this time "with a little more emphasis." A man, later identified as Paul J., defendant's uncle, opened the door and let the officers into the apartment at Encarnacion's request. Encarnacion described J. as approximately 60 years old and seeming "pretty frail" and "sick." The officers went into the living room and saw Evelyn J., Mr. J.'s sister and defendant's aunt, who was also around 60 years old and wheelchair-bound.

Encarnacion asked Ms. J. whether everyone in the apartment was all right, and she said that everything was fine. She also said that neither she nor Mr. J. had called 911. Encarnacion then radioed police dispatch, asking them to call back the number from which the 911 call had come, and the land line phone rang inside the apartment, with the dispatcher on the other end.

Encarnacion then told Ms. J. that the call had come from the apartment, and asked whether he could look through the apartment, saying, in effect, "This is the type of job I have. I have to make sure that everyone is all right in the apartment and that there isn't anybody else in the apartment." Encarnacion testified that he wanted to check the apartment because "it is not uncommon that things are going on in the apartment that people don't want us to know." According to Encarnacion, Ms. J. consented to allow the officers to proceed through the apartment.

Encarnacion went to look through each individual room to make sure no one was there, looking inside the rooms and behind the doors. Eventually, Encarnacion reached a bedroom and noticed, on a dresser across from the door, a scale with white residue and some baking soda. Upon seeing these items, which "drew his attention," Encarnacion proceeded further into the room, and saw an open cigar box with a plate, box cutter, empty "baggies," a folded calling card, a strainer, and what he believed to be a large rock of crack cocaine.

Encarnacion also saw that the bedroom appeared to belong to a teenager, as it contained a PlayStation system, a book bag, school books, handwritten pages of homework, and a stack of

sneaker boxes. The room's window was closed, but the window guard had been opened, and there was a drop of about five or six feet to the ground. Defendant's jacket, which he later identified as his, was on the bed.

As Encarnacion was calling his supervisor, defendant entered the apartment, wearing a white t-shirt and dark jeans, with a cut on his arm. According to Encarnacion, defendant was acting "extremely nervous," and wearing only the t-shirt even though the weather was cold that day. Encarnacion asked defendant where he was coming from, and defendant replied that he was coming from the fifth floor, where he had been visiting a friend. When Encarnacion asked for his friend's name, defendant responded, "Well, we were in the staircase." Encarnacion again asked where the friend lived, and defendant repeated, "We were up on the fifth floor. We were up in the staircase."

The officers then asked Ms. J. who occupied the room where the narcotics were found, and she replied that it was her room. Encarnacion responded that in fact, it looked "like a kid's room," and asked what the baking soda and scale were for. Ms. J. replied that she had the baking soda in her room because sometimes defendant "got it and thr[ew] it around," and that she had the scale because she had to weigh her medication. According to Encarnacion, the officers did not believe her, and told her so. Encarnacion said that he could bring Ms. J. down to the station, "possibly" raising his voice as he said so. Ms. J. then stated that the room was, in fact, defendant's. The officers then took defendant into custody.

To justify a search under the exigent circumstances or "emergency" doctrine, the police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property; the search must not be primarily motivated by intent to arrest and seize evidence; and there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched (*People v Dallas*, 8 NY3d 890, 891 [2007]; *People v Mitchell*, 39 NY2d 173, 177-178 [1976], *cert denied* 426 US 953 [1976]).

In this case, the police were sent to the apartment as a result of a 911 call which was traced to the apartment; yet, the two apparently feeble occupants denied making the call. The caller had hung up without leaving a message. Additionally, an individual had been observed running from the apartment, and no one had responded to the officers' initial requests to enter. In light of these five factors, which the concurrence mostly ignores, we do not suggest by any means that exigent circumstances

existed merely because Ms. J. denied that she or Mr. J. had called 911. Indeed, an emergency doctrine analysis is based on "the totality of the information available to the police" at the relevant time (*see People v Stergiou*, 279 AD2d 387, 387 [2001], *lv denied* 96 NY2d 835 [2001]). Moreover, "[t]he touchstone of the Fourth Amendment is reasonableness" (*People v Molnar*, 98 NY2d 328, 331 [2002]).

In that vein, the police clearly had reasonable grounds to want to search the apartment further. As the officer testified, "anything" could be amiss. It was not beyond the realm of possibility that there were other individuals in the apartment, and that someone might even be held hostage in one of the other rooms. For a police officer not to exercise good judgment and inspect the rest of the apartment would be tantamount to dereliction of duty. If the officers had left the apartment, and it was subsequently discovered that a crime was being committed, including possibly one involving physical harm to the occupants, the officers would have been hard-pressed to defend their actions.

In *People v Paez* (202 AD2d 239 [1994], *lv denied* 84 NY2d 871 [1994]), police responded to a report of a domestic dispute. They "were told by the man who answered the door that everything was allright [*sic*], but then, after asking whether the 'lady of the house' was home, were invited into the apartment and pointed toward the bedroom where the only woman present was standing in the doorway." This Court determined that "despite the assurances of the man who answered the door, the police were justified in entering the bedroom to speak to this woman and determine whether she was safe" (*id.*).

Considering the factors enumerated above, the police here, like the police in *Paez*, were justified in putting little credence in the J.s' denials that they had made the call, or their representations that nothing was amiss. The police had reasonable grounds to believe that there was an emergency that might implicate the need to prevent physical injury, the search was certainly not motivated by an intent to arrest or seize evidence, and there was a justifiable reason to search the rest of the apartment.

Ultimately, and thankfully, no one's safety was at risk. Nevertheless, the knowledge gained from hindsight is not available to the officer involved in a developing situation, and cannot be used to determine whether exigent circumstances exist. Only the contemporaneous facts known at the time to the officer can be considered in evaluating the propriety of his or her conduct.

Defendant failed to preserve his contention that the incrimi-

nating character of the paraphernalia was not immediately apparent to the officer, and we decline to review it in the interest of justice. As an alternative holding, we also reject it on the merits. Concur—Saxe, DeGrasse and Abdus-Salaam, JJ.

Mazzarelli, J.P., and Manzanet-Daniels, J., concur in part in a seperate memorandum by Manzanet-Daniels, J., as follows: I agree with the majority that the court properly denied the suppression motion, given evidence that the apartment's tenant consented to the search. There is thus no reason to reach the question of whether exigent circumstances justified the search. It is a basic precept of appellate jurisprudence that we refrain from addressing issues unnecessary to the disposition of the case. To the extent the majority suggests that the mere denial of having made a 911 call constitutes exigent circumstances, I must vehemently disagree. The majority's opinion today creates unnecessary confusion and can only further muddy the waters on the issue of what constitutes exigent circumstances.

Under the exigent circumstances or "emergency" doctrine, the police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property; the search must not be primarily motivated by intent to arrest and seize evidence; and there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched (*People v Dallas*, 8 NY3d 890, 891 [2007]; *People v Mitchell*, 39 NY2d 173, 177-178 [1976], *cert denied* 426 US 953 [1976]). No such emergency existed in this case. Both Paul and Evelyn J. stated that no one had called 911, and there was nothing evidently amiss in the apartment. Indeed, the factual situation presented here differs markedly from other cases in which exigent circumstances existed. For example, in *People v McBride* (59 AD3d 151 [2009], *affd* 14 NY3d 440 [2010], *cert denied* 562 US —, 131 S Ct 327 [2010]), detectives, who admittedly had probable cause to arrest the defendant for an armed robbery, went to his apartment, climbed the fire escape, and saw him lying face down on a bedroom floor. Other detectives at the apartment's door were then "greeted by a distraught and hyperventilating young woman who was unable to respond to their inquiries as to what was going on and whether she was all right" (*id.* at 152). This Court concluded that the warrantless entry was justified by exigent circumstances, emphasizing the violent nature of the underlying offense, the knowledge of the police that defendant was in the apartment and their reasonable belief that he was armed, and the demeanor of the woman, suggesting a "dangerous and volatile situation" (*id.*). Similarly,

in *People v Paulino* (216 AD2d 238 [1995], *lv denied* 87 NY2d 849 [1995]), "police heard loud screams emanating from an apartment on the floor of a building where an elderly woman on the street had indicated there was a 'problem.' " In *People v Paez* (202 AD2d 239 [1994], *lv denied* 84 NY2d 871 [1994]), the police, who had responded to a report of a domestic dispute, were told by the man who answered the door that everything was all right, but then, after asking whether the "lady of the house" was home, were invited into the apartment and directed toward the bedroom where the only woman present was standing in the doorway (*id.*). This Court determined that "despite the assurances of the man who answered the door, the police were justified in entering the bedroom to speak to this woman and determine whether she was safe" (*id.*).

Here, by contrast, no facts presented could have given officers any concern that anyone was in danger, as there were no obvious disturbances or noises in the apartment, nor was there any report of a domestic dispute. Nor, as in *Paez*, was there any indication that anyone other than Paul and Evelyn J. was in the apartment. Once officers arrived at the apartment and questioned the occupants, there did not appear to be any circumstance posing an imminent threat to anyone in the apartment (*see People v Christianson*, 57 AD3d 1385, 1387 [2008]). **[Prior Case History: 20 Misc 3d 1133(A), 2008 NY Slip Op 51715(U).]**