STATE of Alaska, Petitioner,

v.

Robert Duane GIBSON, III, Respondent.

No. S–13509.

Supreme Court of Alaska.

Jan. 13, 2012.

---

646

W.H. Hawley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Petitioner.

Sharon Barr, Assistant Public Defender, and Quinlan G. Steiner, Public Defender, Anchorage, for Respondent.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

WINFREE, Justice.

## I. INTRODUCTION

In this appeal we consider the long-standing emergency aid exception to the general requirement that a search warrant be obtained prior to police entry into a residence. Today we establish that the Alaska Constitution's standards for justifying the doctrine's application go beyond those required by the

United States Constitution, and we adopt the standards our court of appeals first implemented in *Gallmeyer v. State*.[1] We then consider whether the court of appeals correctly applied the doctrine when it reversed the trial court's ruling that the doctrine excused the warrantless police entry in this case. Because the police had a reasonable belief of an emergency justifying a warrantless entry into the residence, we conclude the court of appeals did not and we reverse its decision.

## II. FACTS AND PROCEEDINGS

### A. The Incident

In July 2002 Lisa Bevin and Robert Gibson lived together in Gibson's trailer. Bevin became angry when she awoke to Gibson preparing to cook methamphetamine; Gibson reacted by threatening to "stab [her] in the head." Bevin then called 911. The 911 operator logged the call as: "Female stated male was threatening to stab her in the head," and noted she could hear a disturbance in the background. Anchorage Police Officers Justin Doll and Francis Stanfield were dispatched to the scene, arriving in separate patrol cars.

When the officers arrived they heard a distressed "female voice crying, upset, screaming, yelling" from inside the trailer. As the officers approached the trailer, Bevin tumbled out the door wearing only a tank top and crying "help me." Bevin had visible swelling in one eye and a bleeding cut on the back of her head. The officers drew their weapons and called for backup. Against the officers' urgings, Bevin returned inside for more clothing.

As Bevin started back into the trailer, Gibson became visible through the doorway. The officers ordered Gibson out of the trailer, handcuffed him, and put him in a patrol car. Bevin emerged from the trailer fully clothed, but was agitated, argumentative, and uncooperative when questioned by the officers. Worried "she might start to fight"

with them or Gibson, the officers put Bevin in a patrol car. The officers then informed the backup officer that he no longer needed to respond at the emergency level "because of the increased danger involved" in such a response.

The officers were not certain at that time who had called 911, whether anyone else lived in the trailer, or who the assailant had been. After Bevin and Gibson were detained, Officer Stanfield did not "hear any evidence of any kind that another party, a third person was in [the] trailer." Officer Doll similarly did not see or hear anyone inside the trailer, and "saw nothing else that would indicate that there was another person inside." Bevin, when asked, told the officers nobody else was in the trailer. Neither officer took Bevin's statement "at face value"; in Officer Stanfield's experience people "[r]egularly" lie "in domestic violence situations," and in Officer Doll's experience "people [had] lied to [him] in the past."

When Officer Gerard Asselin arrived approximately 25 minutes after Gibson and Bevin were secured, Officers Stanfield and Doll entered the trailer. Officer Doll testified that because the dispatch indicated "a disturbance possibly involving a knife," the officers wanted "to make sure that nobody [was] ... lying wounded inside the trailer." Officer Doll further confirmed that entering the premises in domestic violence situations "that may have involved a weapon," where "the risk is a little higher," is "standard operating procedure" even when an officer has "no reason to believe somebody is inside" because, as he noted, police "have a duty to provide aid to anybody inside." While they were "clearing" the trailer, the officers noticed evidence suggesting methamphetamine manufacturing.

After exiting the trailer Officer Doll told Officer Asselin that there "could be a meth lab" inside. As Officer Asselin was more familiar than Officers Stanfield and Doll with methamphetamine labs, and because he

1. 640 P.2d 837, 842 (Alaska App. 1982) (adopting standards requiring "reasonable grounds to believe ... an emergency [is] at hand," that search not be "primarily motivated by intent to arrest and seize evidence," and "some reasonable basis ... to associate the emergency with the area or place to be searched" (quoting *People v. Mitchell*, 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607, 609 (1976))).

"[knew] them to be dangerous in nature," he entered the trailer to determine whether "it need[ed] to be dealt with right at that moment." Observing chemicals, glassware, and other evidence of methamphetamine production, Officer Asselin concluded that "production of methamphetamine was occurring."

Based on Officer Asselin's conclusion, Detective Bruce Bryant and another detective from the Anchorage Police Department's Metro Drug Unit were dispatched to the scene. Following a brief walk-through of the trailer, Detective Bryant applied for and obtained a search warrant. The police executed the warrant that night, seizing methamphetamine production evidence from the trailer.

### B. The Superior Court

In September 2002 the State of Alaska indicted Gibson on four counts related to the manufacture of methamphetamine. Bevin was indicted on the same four counts. In May 2003 the State added one count of fourth-degree assault against Gibson for "recklessly caus[ing] physical injury" to Bevin. The State later dropped one of the methamphetamine-related counts against Gibson and amended another.

Bevin moved to suppress the evidence seized as a result of the warrantless searches of the trailer. Gibson filed his own motion to suppress the evidence and dismiss the indictment against him. The superior court held an evidentiary hearing on the suppression motions over five days in 2003. Officers Stanfield, Doll, and Asselin testified, along with Detective Bryant and others. The court held oral argument on the motions in February 2004, ultimately denying them with a written order making factual findings. The court concluded Officers Stanfield and Doll's "warrantless entry was justified by the emergency aid doctrine." The court confined its findings and conclusions "to the facts of this case" recognizing that there is not "a general warrantless search exception for all domestic violence cases."

Analyzing the emergency aid doctrine under the three-prong test the Alaska Court of Appeals adopted in *Gallmeyer*,[2] the court determined that all three prongs were satisfied. First, the court found the reasonable grounds factor was met because "the officers arrived at the scene of a domestic disturbance reportedly involving a weapon," "heard a female screaming," and "saw a woman stumbling out of the trailer half naked and injured"; Bevin was "hysterical, uncooperative and argumentative," and the officers were not "certain about how many people were involved." The court therefore concluded the officers' belief that an injured party might be inside and in need of emergency aid was objectively reasonable. The court determined the second factor was met, as "[t]here was absolutely no evidence ... that something outside the trailer led [the officers] to suspect that there could be a meth lab inside," and the officers' subjective motivation for entering the trailer was to determine whether there was anyone inside in need of emergency aid. The court further determined the final factor was met, as the search was sufficiently "restricted in time and scope to the nature and duration of the particular emergency." Additionally, the court concluded exigent circumstances justified Officer Asselin's subsequent search and the inevitable discovery doctrine justified Detective Bryant's later search.

Following a two-week trial a jury found Gibson guilty on the three methamphetamine-related counts and of disorderly conduct, a lesser included offense of the assault charge.

### C. The Court Of Appeals

Gibson appealed, arguing the superior court erred in denying his suppression motion.[3] The court of appeals applied the *Gallmeyer* three-prong test and reversed, holding Officers Stanfield and Doll's initial entry was not justified under the emergency aid exception to the warrant requirement and was therefore unlawful.[4] The court concluded

---

**2.** *See* note 1, above.

**3.** *Gibson v. State*, 205 P.3d 352, 353 (Alaska App.2009).

**4.** *Id.* at 354–56.

"the circumstances surrounding the search ... would not 'have led a prudent and reasonable officer to perceive an immediate need to take action in order to prevent death or to protect against serious injury to persons or property.'"[5]

The court further explained:

In order to enter a home based upon the emergency aid exception, we believe that the State must show "true necessity—that is, an imminent and substantial threat to life, health, or property." In addition, although *Gallmeyer* emphasizes that a showing of necessity does not "require absolute proof that injury would necessarily have occurred," this test implies that a mere possibility that an emergency exists will ordinarily not be sufficient.[6]

Finding "[t]he State justifie[d] the police entry into Gibson's home based on speculation," the court expressed concern that if it "were to authorize the police to enter someone's home based on these facts, the police would routinely be able to search a residence in most cases where there was a report of a serious domestic dispute."[7] It reversed the conviction and remanded the case for the superior court to determine what evidence should be suppressed.[8]

5. *Id.* at 353 (quoting *Gallmeyer*, 640 P.2d at 842).

6. *Id.* at 356 (quoting *Gallmeyer*, 640 P.2d at 843–44).

7. *Id.*

8. *Id.*

9. *State v. Joubert*, 20 P.3d 1115, 1118 (Alaska 2001) (citing *Castillo v. State*, 614 P.2d 756, 765–66 (Alaska 1980)).

10. *State v. Miller*, 207 P.3d 541, 543 (Alaska 2009) (quoting *Joubert*, 20 P.3d at 1118).

11. *Id.* (quoting *Joubert*, 20 P.3d at 1118).

12. *State v. Blank*, 90 P.3d 156, 159 n. 19 (Alaska 2004) (citing *State v. Page*, 911 P.2d 513, 515–16 (Alaska App.1996)).

13. *Id.* (citing *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Lupro v. State*, 603 P.2d 468, 476 (Alaska 1979)).

14. The relevant provisions of the Alaska Constitution are article I, sections 14 and 22. Section 14 provides:

We granted the State's petition for hearing.

## III. STANDARD OF REVIEW

■■■ We generally "review a denial of a motion to suppress in the light most favorable to upholding the trial court's ruling."[9] "The trial court's findings of fact will not be disturbed unless they are clearly erroneous."[10] But "[w]e independently determine whether the trial court's factual findings support its legal conclusions."[11] And "[w]hether a particular search falls within an exception to the warrant requirement is a question of law" that we review de novo.[12]

## IV. DISCUSSION

### A. The Emergency Aid Exception To The Warrant Requirement

#### 1. Overview

■■■ Police typically must obtain a warrant to lawfully search a home.[13] Under the Alaska Constitution[14] "a search without a warrant is per se unreasonable unless it clearly falls within one of the narrowly defined exceptions to the warrant requirement."[15] Under the Fourth Amendment of the United States Constitution[16] "searches

The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated. No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Section 22 provides in relevant part: "The right of the people to privacy is recognized and shall not be infringed."

15. *Schultz v. State*, 593 P.2d 640, 642 (Alaska 1979) (quoting *Woods & Rohde, Inc. v. State, Dep't of Labor*, 565 P.2d 138, 149 (Alaska 1977)).

16. The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment's protection against unreasonable searches and seizures was applied to the states via the Fourteenth Amendment in

and seizures inside a home without a warrant are presumptively unreasonable." [17] "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." [18]

 One such exception—under both federal and Alaska law—is the emergency aid exception.[19] This petition leads us to consider the development of Alaska's emergency aid doctrine, clarify standards for the emergency aid exception to the Alaska Constitution's search warrant requirement, and apply those standards in the context of two competing policy concerns: (1) the constitutional right of privacy in the home and (2) the scope of police duties during a domestic violence investigation.

### 2. Alaska Supreme Court cases

#### a. *Stevens v. State*

Alaska's emergency aid doctrine originated with *Stevens v. State*, which relied on *United States v. Barone* for the general rule that "[t]he right of the police to enter and investigate in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their duties as police officers, and derives from the common law." [20]

In *Stevens*,[21] Stevens shot and killed a friend during early morning drinking at Stevens' house in Hoonah. Stevens' children fled the house and told a neighbor about the shooting. The neighbor phoned the Hoonah chief of police, who went to Stevens' house and knocked on the door. Stevens' wife opened the door, and the chief entered without any comment by either. When Stevens sobbingly confessed he had "shot his 'buddy'" and threatened suicide, the chief arrested and jailed Stevens for his own safety. The chief returned shortly thereafter with the Hoonah mayor. The chief and mayor briefly inspected the house, viewed the victim's body, and then left, padlocking the house. The mayor contacted state troopers in Juneau for assistance, and a trooper ordered the premises be kept locked and advised the chief to also confine Stevens' wife. The troopers arrived seven hours later, ten hours after the chief's original entry, and entered the house without a search warrant to conduct a homicide investigation. Stevens and his wife were still incarcerated and were unaware of the troopers' warrantless entry into their house. At trial Stevens sought to prevent presentation of the evidence gathered during the troopers' warrantless search of his house, but the trial court allowed it. Stevens ultimately was convicted of manslaughter.

On appeal Stevens conceded the chief's original entry was lawful.[22] The court stated the "general rule" that the right to enter and investigate in an emergency, without an accompanying intent to search or arrest, derives from the common law and is an inherent police duty.[23] The court further observed that "[t]he criterion is the reasonableness of the belief ... as to the existence of an emergency, not the existence of an emergency in fact." [24] The court concluded that given the phone call from Stevens' neighbor, which was based on knowledge gained from Stevens' children,

Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

**17.** *Groh v. Ramirez*, 540 U.S. 551, 559, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (quoting *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)).

**18.** *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) (citing *Flippo v. West Virginia*, 528 U.S. 11, 13, 120 S.Ct. 7, 145 L.Ed.2d 16 (1999) (per curiam); *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)).

**19.** *Brigham City*, 547 U.S. at 403, 126 S.Ct. 1943 (citing *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)); *Stevens v. State*, 443 P.2d 600, 602 (Alaska 1968).

**20.** 443 P.2d at 602 (quoting *United States v. Barone*, 330 F.2d 543, 545 (2d Cir.1964)).

**21.** The following summary of the underlying *Stevens* facts is based on 443 P.2d at 601–03.

**22.** *Id.* at 602.

**23.** *Id.* (quoting *Barone*, 330 F.2d at 545).

**24.** *Id.* (quoting *Patrick v. State*, 227 A.2d 486, 489 (Del.1967)).

the chief "had reason to believe that an emergency existed when he knocked at the door of [Stevens'] home," and even though he entered uninvited, his entry "was made under the same reasonable belief."[25]

The court built on that conclusion, explaining that after legally entering Stevens' home and learning of the homicide, the chief's duty to investigate included the right to inspect the premises;[26] had the chief conducted his investigation immediately, he could have taken pictures, made measurements, and retrieved evidence in plain view without violating Stevens' constitutional rights against unreasonable searches and seizures.[27] The court concluded the ten-hour delay between the chief's original entry and the troopers' later entry did not convert what otherwise would have been a legal investigation into a violation of constitutional privacy rights.[28]

Justice Rabinowitz concurred in the decision, agreeing with the court's recognition of the *Barone* emergency aid doctrine and its conclusion that the chief's initial entry into the home was lawful, but viewing the totality of the circumstances as supporting a lawful search of Stevens' house incident to Stevens' arrest.[29] Justice Rabinowitz made two key points guiding the assessment of potential emergencies.[30] First, he noted "[t]he reasonableness of an entry by the police upon private property is measured by the circumstances then existing."[31] Second:

> The preservation of human life is paramount to the right of privacy protected by search and seizure laws and constitutional guaranties; it is an overriding justification

for what otherwise may be an illegal entry. It follows that a search warrant is not required to legalize an entry by police for the purpose of bringing emergency aid to an injured person. Frequently, the report of a death proves inaccurate and a spark of life remains, sufficient to respond to emergency police aid. As a general rule ... an emergency may be said to exist, within the meaning of the 'exigency' rule, whenever the police have credible information that an unnatural death has, or may have, occurred. And the criterion is the reasonableness of the belief of the police as to the existence of an emergency, not the existence of an emergency in fact.[32]

#### b. *Schraff v. State*

In *Schraff v. State*,[33] a trooper conducting a routine bar check noted one of the patrons, Schraff, was inebriated. While securing Schraff's vehicle, the trooper discovered a large quantity of marijuana and contacted narcotics investigators for assistance. When a narcotics investigator requested identification, Schraff allowed his friend to hand Schraff's wallet to the investigator. While briefly looking through the wallet for identification, the investigator discovered a foil packet containing cocaine. Schraff was arrested and later convicted of cocaine possession.

Schraff appealed his conviction, challenging the investigator's search.[34] In relevant part the State claimed the wallet search "was designed to provide crucial information in the rendition of emergency aid" in light of

25. *Id.*

26. *Id.*

27. *Id.*

28. *Id.* at 602–03. Using the emergency aid doctrine as a foundational predicate to the court's actual holding likely moved the court's approval of that doctrine beyond dictum notwithstanding Stevens' concession that the chief's initial entry was lawful. *See VECO, Inc. v. Rosebrock*, 970 P.2d 906, 922 (Alaska 1999) (concluding discussion in previous case "was necessary for our holding" and therefore not dictum); *Gonzales v. Krueger*, 799 P.2d 1318, 1322 (Alaska 1990) (Moore, J., concurring) (stating language in pre-

vious decision was not dictum because it was necessary to reach the conclusion).

29. *Stevens*, 443 P.2d at 604–06 (Rabinowitz, J., concurring).

30. *Id.* at 605 (quoting *Patrick*, 227 A.2d at 489).

31. *Id.* (quoting *Patrick*, 227 A.2d at 489).

32. *Id.* (quoting *Patrick*, 227 A.2d at 489).

33. 544 P.2d 834 (Alaska 1975). The following summary of the underlying *Schraff* facts is based on 544 P.2d at 836–38.

34. *Id.* at 837–38.

Schraff's "stupified condition."[35] The court pointed to *Barone* for the modern emergency aid doctrine and noted the *Stevens* court's recognition of the " 'emergency' exception" to the warrant requirement.[36] The court also noted the "business of policemen and firemen is to act, not to speculate or meditate on whether [a] report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process. Even the apparently dead often are saved by swift police response."[37]

The court reviewed cases from other jurisdictions to evaluate the State's emergency aid claim. These included a Sixth Circuit case upholding a search of a seizing man's luggage,[38] a D.C. Circuit case upholding a search of an unconscious man's person,[39] a California case upholding a search of a man in shock and suffering from knife wounds,[40] an Illinois case upholding a search of a disoriented and incoherent man who did not seem drunk,[41] and a Washington case upholding a search of an unconscious man in his hotel room based on needle track marks on his arms.[42] In each case the reviewing court had upheld the challenged search as within the ambit of the emergency aid doctrine.

The court nevertheless rejected the State's claim. The court first noted the narcotics investigator arrived at the scene to engage in a narcotics investigation, not to render emergency aid, and that multiple motives—including crime detection—prompted him to search Schraff's wallet.[43] The cited emergency aid cases, in contrast, involved "officers [who] claimed that their only motivation was that of rendering aid to an injured person."[44] The court also noted Schraff was not totally unconscious and was accompanied by a "somewhat responsive" companion, suggesting the officers had a way of getting necessary information about Schraff without searching his wallet.[45]

Justice Boochever and Chief Justice Rabinowitz concurred, agreeing that the emergency aid doctrine was inapplicable based on the facts of the case, but contending that if the officers had "reasonably believed that it was necessary" to gather Schraff's identification for medical purposes, the search ought not be disqualified simply because of an accompanying motive to detect crime.[46] To do so would inhibit police from fulfilling common law duties to Alaskan citizens that all members of the court agreed police owe.[47] They also felt a rule requiring an "alone and unconscious" victim too "narrow a reading of the emergency exception," and were inclined to allow the emergency aid exception to the warrant requirement when police reasonably believed a "medical emergency existed (an imminent and substantial threat to life or health)" and that a search of the sick or injured person for immediate identification was necessary.[48]

35. *Id.* at 841.

36. *Id.* at 841–42 (quoting *Barone*, 330 F.2d at 545) (citing *Stevens*, 443 P.2d at 602) (stating *Stevens* court "upheld the search because the officers' belief in the existence of an emergency was reasonable").

37. *Id.* at 842 n. 10 (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C.Cir.1963)).

38. *Id.* at 842 (citing *United States v. Dunavan*, 485 F.2d 201 (6th Cir.1973)).

39. *Id.* at 842–43 (citing *Vauss v. United States*, 370 F.2d 250 (D.C.Cir.1966)).

40. *Id.* at 843 (citing *People v. Gonzales*, 182 Cal. App.2d 276, 5 Cal.Rptr. 920 (1960)).

41. *Id.* (citing *People v. Smith*, 47 Ill.2d 161, 265 N.E.2d 139 (1970)).

42. *Id.* (citing *State v. Jordan*, 79 Wash.2d 480, 487 P.2d 617 (1971)).

43. *Id.* at 844.

44. *Id.*

45. *Id.*

46. *Id.* at 848 (Boochever, J., concurring). The concurring opinion also noted "[t]he emergency doctrine is based on a showing of a true necessity—that is, an imminent and substantial threat to life, health or property." *Id.* at 848 n. 1.

47. *Id.* at 848.

48. *Id.*

### c. *City of Nome v. Ailak*

*City of Nome v. Ailak* [49] involved a homeowner's civil suit for, among other claims, trespass. When Nome police officers stopped Ailak outside his residence on the report of a rape and murder, the man who had reported the crimes pointed at Ailak's house and told police that a body was inside. Without obtaining permission or knocking, the police entered Ailak's home and asked the people occupying the home where the body was; the occupants explained that "a crazy girl" had attempted to gain entry earlier but they would not let her in. The officers subsequently left. After trial on Ailak's claims, a jury awarded him $10,000 for trespass.

On appeal the City conceded its police had entered Ailak's residence without consent, but maintained police may assert as a defense to trespass that they are privileged to enter a citizen's home without permission or a warrant in emergency situations. [50] The court acknowledged the case did not confront whether a warrant was necessary to justify police entry into Ailak's residence, but cited Justice Rabinowitz's *Stevens* concurrence with approval, stating the same concerns applied "to the issue of whether police officers should be civilly liable for trespass as a result of their unauthorized entry into a home." [51] The court quoted Justice Rabinowitz's broad formulation of potential emergencies: "As a general rule ... an emergency may be said to exist ... whenever the police have credible information that an unnatural death has, or may have[,] occurred." [52]

The court reiterated that police owe civilly actionable duties "to go to the aid of imperiled citizens." [53] The court stated the "reasonableness of the belief of the police as to the existence of an emergency, not the existence of an emergency in fact" controlled the propriety of the police's actions. [54] Because the officers were told that a body was in the Ailak home, and "police officers should be encouraged to check out such reports as quickly as possible in case 'a spark of life remains,'" the court concluded the officers' entry into the Ailak home was privileged as a matter of law. [55]

### d. *State v. Myers*

In *State v. Myers*, [56] police officers on routine patrol conducted a security check in an alley and discovered a theater's fire exit door open. Following customary procedures, they entered the building to search for intruders. As the officers walked down a hallway they heard voices from a backstage area. They looked in and saw three individuals, including the theater manager, sitting on the floor with cocaine paraphernalia. The officers arrested the individuals and seized the evidence. The trial court granted the defendants' suppression motion and the State appealed.

The court reversed, holding the entry and limited search were police actions for which no warrant was required and were otherwise reasonable within the meaning of constitutional protections. [57] Relying on diminished expectations of privacy in commercial premises, the court ruled police:

> may enter commercial premises without a warrant only when, pursuant to a routine after-hours security check undertaken to protect the interests of the property owner, it is discovered that the security of the premises is in jeopardy, and only when there is no reason to believe that the owner would not consent to such an entry.... Any search conducted incident to a legitimate entry must be brief and must be

---

49. 570 P.2d 162 (Alaska 1977). The following summary of the underlying *City of Nome* facts is based on 570 P.2d at 165–67.

50. *Id.* at 166.

51. *Id.*

52. *Id.* (quoting *Stevens*, 443 P.2d at 605).

53. *Id.*

54. *Id.* at 167 (quoting *Stevens*, 443 P.2d at 602).

55. *Id.* The court expressly refrained from ruling whether the situation was sufficient to justify entry without a warrant for a criminal case. *Id.* at 167 n. 8.

56. 601 P.2d 239 (Alaska 1979). The following summary of the underlying *Myers* facts is based on 601 P.2d at 240–41.

57. *Id.* at 241.

limited and necessary to the purpose of ensuring that no intruders are present on the premises.[58]

Justice Rabinowitz concurred, but on the basis that the search fell within the emergency aid exception to the warrant requirement.[59] Justice Rabinowitz believed the court should expressly adopt the emergency aid exception delineated in the New York case of *People v. Mitchell* with the following essential components:

(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

(2) The search must not be primarily motivated by intent to arrest and seize evidence.

(3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.[60]

Chief Justice Boochever dissented, concluding the court's general reasonableness analysis was too generous in light of the availability of other less intrusive alternatives to the police entry.[61] Reasoning that the only possible exception to the warrant requirement was the emergency aid exception,[62] Chief Justice Boochever concluded the court should recognize the emergency aid exception as defined in *Mitchell*, subject to a requirement that no search could be justified

under that exception if a reasonable alternative were available.[63] But the Chief Justice noted the emergency exception was not applicable under the facts of the case because the police had reasonable alternatives to the warrantless entry into the theater.[64]

### 3. Alaska Court of Appeals

In *Gallmeyer v. State*[65] an intoxicated Gallmeyer struck his wife, threatened her with a firearm, and forcibly expelled her from their home. The wife ran to a neighbor's house and called the police, asking for help removing the couple's 15–month–old daughter from the home. Two officers were dispatched, but highway delays substantially slowed their arrival. The wife called again, insisting she needed immediate help. The wife then approached her home and asked Gallmeyer to bring their daughter outside— she told him that in exchange, she would not ask the police to enter the house once they arrived. Gallmeyer complied, leaving the infant on the front porch; the wife did not remove the child. Once the officers arrived, the wife—speaking hysterically and with a bloody mouth—asked them to retrieve the child. She informed the officers that Gallmeyer was drunk, described the domestic violence, and warned them that he possessed several handguns. One of the officers approached the home. Fearing for both his and the child's safety, the officer decided to speak with Gallmeyer first rather than imme-

---

**58.** *Id.* at 244.

**59.** *Id.* at 245 (Rabinowitz, J., concurring) (citing *Schraff*, 544 P.2d at 841; *Stevens*, 443 P.2d at 602).

**60.** *Id.* (quoting *People v. Mitchell*, 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607, 609 (1976)). The *Mitchell* court considered the emergency aid doctrine under the Fourth Amendment to the United States Constitution and noted the difficult problems of evaluation and judgment by both the police and reviewing courts. *Mitchell*, 383 N.Y.S.2d 246, 347 N.E.2d at 609. The court articulated the necessary guidelines for the doctrine's application and further explained the underpinnings of each prong of its standard, summarized as follows: (1) police must have valid reasons for the belief of an emergency, grounded in empirical facts rather than subjective feelings; (2) protection of human life or property must be the primary motivator for the police; and (3) the

limited privilege afforded by the emergency doctrine does not give police carte blanche to look for evidence of a crime—there must be a direct relationship between the search area and the emergency. *Id.* at 609–10.

**61.** 601 P.2d at 245–47 (Boochever, C.J., dissenting).

**62.** *Id.* at 247–48 (discussing *Schraff's* listing of exceptions to warrant requirement and concluding only emergency aid exception possible under facts of case).

**63.** *Id.* at 251.

**64.** *Id.* at 250–51.

**65.** 640 P.2d 837. The following summary of the underlying *Gallmeyer* facts is based on 640 P.2d at 837–42.

diately remove the baby from the porch. Gallmeyer acknowledged the officer, who then entered the home. The officer immediately noticed Gallmeyer had a gun in his pants waistband and reached to remove it. Gallmeyer reached for another firearm nearby and a fight broke out. The officer subdued Gallmeyer without injury and arrested him for possession of a firearm while intoxicated.

After an investigation revealed Gallmeyer had a prior felony conviction, he was indicted for being a felon in possession of a firearm.[66] He moved to suppress evidence of his firearms as the product of a warrantless entry into and search of his home.[67] The superior court denied Gallmeyer's motion on the ground that the police entry "was solely investigative in nature and was meant to assure the safety of the officer and the Gallmeyers' baby."[68] Gallmeyer was convicted and he appealed.[69]

On appeal the State argued the emergency aid exception to the warrant requirement justified the police entering Gallmeyer's home.[70] The court of appeals noted the emergency aid doctrine "has been uniformly recognized as an exception to the warrant requirement," referenced *Schraff*'s "recognition" and *Stevens'* "appli[cation]" of the doctrine, and pointed to the *Barone* statement of the doctrine as "[p]erhaps the most commonly cited statement of the doctrine."[71] It then looked to *Mitchell* to set out the emergency aid doctrine elements: (1) the police must have reasonable grounds to believe there is an emergency at hand and an immediate need for their assistance in the protection of life or property; (2) the search must not be primarily motivated by the intent to arrest a person or to seize evidence; and (3) there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.[72]

The court of appeals first acknowledged that it must accept the superior court's factual findings unless clearly erroneous and must view the evidence in the light most favorable to upholding the superior court's decision.[73] The court then considered whether there were reasonable grounds for the officers' belief that an emergency existed at the Gallmeyers' home.[74] The court described this first prong of the test as an "objective standard,"[75] designed to determine "whether the evidence would have led a prudent and reasonable officer to perceive an immediate need to take action in order to prevent death or to protect against serious injury to persons or property."[76]

Gallmeyer argued that because he was the house's only occupant, no risk of death or harm to anyone justified police intrusion.[77] Taking a broad view of the facts and drawing all favorable inferences on factual findings in favor of the State, the court rejected Gallmeyer's argument, noting: the wife's two emergency calls requesting immediate assistance, the wife was obviously upset at the scene, the wife was bloody and had recently been struck, Gallmeyer had reportedly brandished a weapon, Gallmeyer possessed weapons inside, and the wife had not attempted to secure her daughter without the police.[78] The court concluded it was "apparent that [the police officers] had ample cause to fear that [Gallmeyer] posed an immediate threat of inflicting serious and potentially

---

66. *Id.* at 841.

67. *Id.*

68. *Id.*

69. *Id.* at 839.

70. *Id.* at 841.

71. *Id.* at 841–42 (citations omitted).

72. *Id.* at 842 (quoting *Mitchell*, 383 N.Y.S.2d 246, 347 N.E.2d at 609); *cf. Myers*, 601 P.2d at 245 (Rabinowitz, J., concurring); *id.* at 249, 251 (Boochever, C.J., dissenting).

73. 640 P.2d at 839.

74. *Id.* at 843.

75. *Id.* at 842.

76. *Id.* (citing 2 Wayne R. LaFave, Search & Seizure § 6.6(a), at 468 (1978)).

77. *Id.* at 843.

78. *Id.*

fatal injury" to his wife, his daughter, or the officers.[79]

Only after concluding the officers had an objectively reasonable basis to believe an emergency existed did the court passingly mention the "true necessity" concept: "In reaching this conclusion, we are not unmindful that emergency aid ordinarily requires true necessity—that is, an imminent and substantial threat to life, health or property."[80] The court did not indicate whether this "true necessity" requirement clarified, modified, or simply reiterated its earlier description of the first element under *Mitchell*—a situation leading "a prudent and reasonable officer to perceive an immediate need to take action" to avert death or serious injury.[81] But the court did state that "true necessity" does not require absolute proof that injury would necessarily have occurred without emergency intervention: "in determining necessity, the probability and potential seriousness of the threatened harm must be viewed objectively and balanced against the extent to which police conduct results in a violation of privacy interests."[82]

The court ultimately found the second and third prongs of the test satisfied,[83] noting the superior court's findings on the officer's subjective motivations were "amply supported by the evidence" and conclusively showed the officers were not motivated primarily by a desire to arrest Gallmeyer or search for incriminating evidence.[84] As to the scope of the entry and search, the court further found "the record supports the conclusion that [the officer] was justified in believing" an emergency reasonably precipitated his entry into Gallmeyer's home.[85] The court emphasized

granting officers great flexibility in responding to reasonably perceived emergencies when it analyzed this third element: "[O]nce the existence of an emergency has been determined, and once it has been found that an officer's conduct was motivated by the apparent need to render assistance ... officers must be allowed a broad scope of judgment in the precise manner of dealing with emergency situations."[86] Speaking more particularly to cases of domestic violence, the court added that:

> situations such as the present one, where officers are called upon to intervene in episodes of domestic violence, are often particularly hazardous.... Thus, when officers responding to a call involving domestic violence encounter objective factors sufficient to indicate an imminent danger of death or serious injury ... it is particularly appropriate for courts to be flexible in assessing the reasonableness of the particular manner chosen to deal with the emergency.[87]

The court affirmed Gallmeyer's conviction.[88]

### 4. United States Supreme Court

In 2006 the United States Supreme Court, which had been essentially silent on the emergency aid exception since 1978,[89] granted certiorari in *Brigham City v. Stuart* "in light of differences among state courts and the [federal] Courts of Appeals concerning the appropriate Fourth Amendment standard governing warrantless entry by law enforcement in an emergency situation."[90] The Court held that police "may enter a home

79. *Id.*

80. *Id.* (quoting *Myers*, 601 P.2d at 242 n. 4).

81. *Id.* at 842.

82. *Id.* at 844.

83. *Id.* at 844–46.

84. *Id.* at 844.

85. *Id.* at 844–45.

86. *Id.* at 845.

87. *Id.* at 845 n. 13.

88. *Id.* at 846.

89. *See Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) ("We do not question the right of the police to respond to emergency situations."); *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (noting "the importance of 'prompt inspections, even without a warrant, ... in emergency situations'" (quoting *Camara v. Municipal Court*, 387 U.S. 523, 539, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (alteration in original))).

90. *Brigham City*, 547 U.S. at 402, 126 S.Ct. 1943.

without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." [91] The Court emphasized that the searching officers' subjective intentions and motivations are irrelevant, and consequently rejected the *Mitchell* test's second prong for the purposes of analyzing searches justified under the Fourth Amendment's emergency aid exception.[92]

### B. We Adopt The *Mitchell/Gallmeyer* Standard As The Alaska Constitutional Standard For The Emergency Aid Doctrine.

▮ We first reiterate our statement in *Stevens* that "[t]he right of the police to enter and investigate in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their duties as police officers, and derives from the common law." [93] As Justice Rabinowitz stated in his concurrence:

The preservation of human life is paramount to the right of privacy protected by search and seizure laws and constitutional guaranties; it is an overriding justification for what otherwise may be an illegal entry. It follows that a search warrant is not required to legalize an entry by police for the purpose of bringing emergency aid to an injured person.[94]

▮ We also agree with Justice Rabinowitz that "an emergency may be said to exist ... whenever the police have credible information that an unnatural death has, or may have, occurred" and that "the criterion is the reasonableness of the belief ... as to the existence of an emergency, not the existence

of an emergency in fact." [95] And we reiterate our earlier statement that the "business of policemen ... is to act, not to speculate or meditate on whether [a] report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." [96]

We believe Professor LaFave has aptly described the nature of the question about a reasonable belief of an emergency:

Thus, the question is whether there were "reasonable grounds to believe that some kind of an emergency existed," that is, whether there is "evidence which would lead a prudent and reasonable official to see a need to act." The officer must "be able to point to specific and articulable facts which, taken with rational inferences from those facts, reasonably warrant that intrusion." But ... this probable cause requirement[ ] must be applied by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences. As one court usefully put it, the question is whether "the officers would have been derelict in their duty had they acted otherwise." This means, of course, that it "is of no moment" that it turns out there was in fact no emergency.[97]

Over 40 years ago two members of our court urged the adoption of the *Mitchell* standard for applying the emergency aid doctrine.[98] Our court of appeals first embraced and applied the *Mitchell* standard in *Gallmeyer*, in the context of a suppression challenge under the Fourth Amendment of the United States Constitution,[99] and has applied

91. *Id.* at 400.

92. *Id.* at 404 ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.' The officer's subjective motivation is irrelevant." (quoting *Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978) (emphasis and alteration in original))).

93. *Stevens*, 443 P.2d at 602 (quoting *Barone*, 330 F.2d at 545).

94. *Id.* at 605 (Rabinowitz, J., concurring) (quoting *Patrick*, 227 A.2d at 489).

95. *Id.* (quoting *Patrick*, 227 A.2d at 489).

96. *Schraff*, 544 P.2d at 842 n. 10 (quoting *Wayne*, 318 F.2d at 212).

97. 3 Wayne R. LaFave, Search & Seizure § 6.6(a), at 452–53 (4th ed. 2004) (footnotes omitted).

98. *Myers*, 601 P.2d at 245 (Rabinowitz, J. concurring); *id.* at 245–47 (Boochever, C.J., dissenting).

99. *Gallmeyer*, 640 P.2d at 842–43.

that standard since then.[100] But as noted earlier, the United States Supreme Court recently clarified that the Fourth Amendment does not provide privacy protection as broadly as articulated in *Mitchell*.[101]

We therefore consider whether in this context the Alaska Constitution requires more than the Fourth Amendment and, if so, whether *Gallmeyer*'s adoption of the *Mitchell* standard is appropriate for Alaska. Neither Gibson nor the State actually argues against the *Mitchell* standard but, as we discuss below, the State argues *Gallmeyer*'s application of the standard is inconsistent with the principles outlined in *Stevens* and *Schraff* and should be overruled.

 We conclude the Alaska Constitution article I, sections 14 and 22, affords greater protection against warrantless searches and seizures in the emergency aid context than the United States Constitution[102] and the Alaska Constitution prior to the enactment of section 22.[103] Although the State accurately observes that article I, section 22, does not create an independent ground for suppressing evidence, Alaska courts have used section 22's right to privacy to give section 14's protection against unreasonable searches and seizures "a liberal interpretation."[104] Alaskans' heightened right to privacy is safeguarded by requiring the State to meet all three *Mitchell* test prongs when seeking to justify a warrantless search under the emergency aid exception. We therefore hold the Alaska Constitution requires that warrantless searches under the emergency aid doctrine satisfy all three *Mitchell* test prongs specified in *Gallmeyer*: (1) the police must have reasonable grounds to believe there is an emergency at hand and an immediate need for their assistance in the protection of life or property; (2) the search must not be primarily motivated by the intent to arrest a person or to seize evidence; and (3) there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.[105]

### C. The *Mitchell/Gallmeyer* "True Necessity" Standard Is Flexibly Applied.

We now consider the State's argument that the court of appeals misapplied the

**100.** *See Hotrum v. State*, 130 P.3d 965 (Alaska App.2006); *Mark v. State*, Mem. Op. & J. No. 7661, 2002 WL 341979 (Alaska App., Mar. 6, 2002); *Larson v. State*, Mem. Op. & J. No. 7032, 2000 WL 19199 (Alaska App., Jan. 12, 2000); *Johnson v. State*, Mem. Op. & J. No. 6407, 1998 WL 19470 (Alaska App., Jan. 21, 1998); *Harrison v. State*, 860 P.2d 1280 (Alaska App.1993); *Williams v. State*, 823 P.2d 1 (Alaska App.1991); *Montgomery v. State*, Mem. Op. & J. No. 1185, 1986 WL 1160968 (Alaska App., May 28, 1986); *Krukoff v. State*, 702 P.2d 664 (Alaska App.1985); *Spein v. State*, Mem. Op. & J. No. 7259, 1984 WL 908539 (Alaska App., June 20, 1984); *Zinn v. State*, 656 P.2d 1206 (Alaska App.1982). *See also Hahn v. State*, Mem. Op. & J. No. 6462, 1998 WL 119468 (Alaska App., Mar. 18, 1998) (concluding defendant's arguments contesting application of emergency aid doctrine were not preserved, but noting it would find no plain error in trial court's application of doctrine even if defendant were entitled to raise argument).

**101.** *See* note 92, above, and accompanying text.

**102.** *See Brigham City*, 547 U.S. at 407–08, 126 S.Ct. 1943 (Stevens, J., concurring) (noting state constitutions can offer more robust protection against warrantless searches than Fourth Amendment); *see also* Erwin Chemerinsky, *Privacy and the Alaska Constitution: Failing to Fulfill the Promise*, 20 ALASKA L.REV. 29, 30 (2003) ("Alaska constitutional law is clear that greater rights can be protected under the Alaska Constitution than are recognized under the United States Constitution."); Ronald L. Nelson, *Welcome to the "Last Frontier," Professor Gardner: Alaska's Independent Approach to State Constitutional Interpretation*, 12 ALASKA L.REV. 1, 21 (1995) ("Alaska's discourse on the right to privacy reflects both the state's independence and its unique tradition of emphasizing individual liberties.").

**103.** *See, e.g., Beltz v. State*, 221 P.3d 328, 334 (Alaska 2009) ("[W]e acknowledge that the explicit protection of privacy set out in article I, section 22 of the Alaska Constitution necessarily modifies [earlier precedent] and increases the likelihood that a person's expectation of privacy in garbage can be deemed objectively reasonable.").

**104.** *Municipality of Anchorage v. Ray*, 854 P.2d 740, 750 (Alaska App.1993) (quoting *Wortham v. State*, 641 P.2d 223, 224–25 n. 2 (Alaska App. 1982), *aff'd*, 666 P.2d 1042 (Alaska 1983)); *see also id.* ("[T]he right to privacy granted by Article I, Section 22 does not create a separate, independent right to seek exclusion of evidence.").

**105.** 640 P.2d at 842 (quoting *Mitchell*, 383 N.Y.S.2d 246, 347 N.E.2d at 609).

*Mitchell* standard's first prong in *Gallmeyer.* The State focuses on *Gallmeyer*'s "true necessity" requirement as a part of the *Mitchell* standard's first prong, arguing "[t]he court of appeals erred in requiring the [S]tate to establish 'true necessity' in order to justify the entry." Gibson responds that " '[t]rue necessity' . . . serves merely to define the term 'emergency' and is in accord with this court's prior decisions." The State replies if "true necessity" defines "emergency," the definition "requires proof of a greater emergency than this court required in *Stevens* and its progeny."

The term "true necessity," in the context of the emergency aid exception, originated in *People v. Smith*, a 1972 case in which the California Supreme Court held a police officer's entry into an apartment was unconstitutional under both the United States and California Constitutions.[106] In concluding the search did not fall under the Fourth Amendment's emergency aid exception to the warrant requirement, the California court stated: "[T]he [emergency aid] exception must not be permitted to swallow the rule: in the absence of a showing of true necessity—that is, an imminent and substantial threat to life, health, or property—the constitutionally guaranteed right to privacy must prevail."[107] *Smith's* "true necessity" language first appeared in Alaska case law as a footnote to Justice Boochever's *Schraff* concurrence.[108] Several years later, in *Myers*, we cited a law review article for the parenthetical proposition that " 'emergency aid' ordinarily requires 'true necessity [—] that is, an imminent and substantial threat to life, health or property.' "[109]

We reiterate that invocation of the emergency aid doctrine requires only that the police have objectively reasonable grounds to believe an emergency at hand creates an immediate need for their assistance for the protection of life or property. We also reiterate that this standard does not require the existence of an emergency in fact: "[T]he criterion is the [objective] reasonableness of the belief . . . as to the existence of an emergency, not the existence of an emergency in fact."[110] *Gallmeyer*'s "true necessity" language does not alter these fundamental propositions. We believe the "true necessity" language simply emphasizes the *Gallmeyer* court's recognition that different balancing of interests must arise in different factual settings: "[I]n determining necessity, the probability and potential seriousness of the threatened harm must be viewed objectively and balanced against the extent to which police conduct results in a violation of privacy interests."[111]

As noted above, the "true necessity" language first appeared in Justice Boochever's *Schraff* concurrence; in that case the police encountered an individual sufficiently incapacitated to justify concern for his physical safety.[112] Validity of the officers' actions turned on whether the officers had a reasonable belief a wallet search was necessary to alleviate the perceived emergency.[113] The court concluded Schraff was not so incapacitated that an emergency justifying a wallet search could be objectively seen from the circumstances.[114] In that narrow factual context, "true necessity"—as the court of ap-

**106.** 7 Cal.3d 282, 101 Cal.Rptr. 893, 496 P.2d 1261, 1263–64 (1972).

**107.** *Id.* at 1263.

**108.** *Schraff*, 544 P.2d at 848 n. 1 (Boochever, J., concurring) (citing *Smith*, 101 Cal.Rptr. 893, 496 P.2d at 1263).

**109.** *Myers*, 601 P.2d at 242 n. 4 (citing Edward G. Mascolo, *The Emergency Doctrine Exception to the Warrant Requirement Under the Fourth Amendment*, 22 Buff. L.Rev 419, 434 (1973)). It appears the *Gallmeyer* court was actually quoting this parenthetical, not the law review article to which the opinion attributed the quote. *Compare id. with Gallmeyer*, 640 P.2d at 843.

**110.** *Stevens*, 443 P.2d at 602 (quoting *Patrick*, 227 A.2d at 489); *see also Gallmeyer*, 640 P.2d at 844 ("But 'true necessity' has never been construed to require absolute proof that injury would necessarily have occurred.").

**111.** *Gallmeyer*, 640 P.2d at 844.

**112.** 544 P.2d at 848 (Boochever, J., concurring).

**113.** *Id.* at 844 (majority opinion).

**114.** *Id.*

peals used that term in *Gallmeyer*—was lacking. But, as discussed below, where a perceived emergency's circumstances are far more undefined and the potential harm is more serious, a more liberal view of "true necessity" than the court of appeals used in this case must be invoked to allow the police to fulfill their duties to the public.

 We therefore agree with both parties to some extent. Gibson is correct that "true necessity" is a part of the first prong inquiry whether objectively reasonable grounds support a belief an emergency exists. But as discussed below in the context of this case, the State is also correct that the concept of "true necessity" does not in every case require those objectively reasonable grounds to be based on probabilities rather than possibilities. Application of the emergency aid exception to the warrant requirement cannot be evaluated with across-the-board, rigid, and formalistic standards; it is a flexible doctrine that, as the court of appeals noted in *Gallmeyer*, must be evaluated on a case-by-case basis, balancing the competing interests in light of the actual facts, perceived dangers, and circumstances encountered by police.

## D. We Reverse The Court Of Appeals' Application Of The *Mitchell/Gallmeyer* Standard In This Case

We next consider whether the court of appeals correctly applied the *Mitchell/Gallmeyer* standard to the facts of this case when it concluded the police did not have an objectively reasonable belief of an emergency when they searched Gibson's trailer, reversed the trial court's denial of Gibson's suppression motion, and vacated Gibson's convictions. We conclude it did not and therefore reverse its decision.

---

**115.** *Id.*

**116.** LaFave, note 97, above, § 6.6(a), at 453 (quoting *State v. Hetzko*, 283 So.2d 49, 52 (Fla. Dist.App.1973)).

**117.** *Deal v. State*, 626 P.2d 1073, 1080 (Alaska 1980) (finding police officer justified in entering unsecured vehicle for limited purpose of securing it); *see also Lee v. State*, 490 P.2d 1206, 1209–10

## 1. Police duties

 The emergency aid doctrine is predicated on the notion that during emergencies police have duties to take action that might otherwise violate legally protected rights.[115] We note Professor LaFave's approval of a court's artful articulation of the relevant question in the warrantless search context as whether the police would have been "derelict in their duty" by not taking action.[116] Because this case involves domestic violence, we consider the relevant police duties in that context.

In Alaska there are circumstances where "[a] police officer is under a duty to protect the lives and property of the public."[117] The Alaska Legislature has passed a law specifically outlining the duties of a police officer responding to a crime involving domestic violence.[118] Alaska Statute 18.65.515, entitled "Duties of peace officer in a crime involving domestic violence,"[119] provides in relevant part:

> (a) A peace officer investigating a crime involving domestic violence shall protect the victim and any member of the victim's family and prevent further violence by
>
> > (1) transporting an adult victim and any member of the victim's family from the place of the offense . . . to a location within the community . . . that is a shelter [or other location] requested by the victim;
> >
> > (2) assisting the victim in removing from the residence essential items belonging to the victim . . . ;
> >
> > (3) assisting the victim and any member of the victim's family in obtaining medical treatment necessitated . . . by contacting emergency medical services

---

(Alaska 1971) (establishing police officer duty to go to aid of citizens).

**118.** AS 18.65.515. This case does not present, and we do not consider, the question of whether this statute establishes a duty of care for a civil action.

**119.** *Id.*

or by transporting the victim to a local medical facility. . . . [120]

The text of .515(a), .515(a)(1), and .515(a)(3) each refers to not only the victim of domestic violence but also "any member of the victim's family." This language was deliberate. The bill leading to the addition of AS 18.65.515 as currently in force was passed with conscious reference to the Model Code on Domestic and Family Violence;[121] the analogous Model Code provision to .515(a), however, speaks only to protecting the victim of domestic violence, without mentioning family members or other residents.[122] Similarly, the Model Code analog of .515(a)(3) requires providing only "the victim and any child" access to medical treatment; AS 18.65.515 broadens this requirement to apply to any member of the victim's family. While chapter 18.65 does not define "family," the same title borrows the Model Code's extremely broad definition of "family or household member," defining "family" and "household members" interchangeably.[123] In light of our legislature's special focus on family members, it is relevant that in nearly half of domestic violence incidents in Anchorage between 1999 and 2002, children under the age of 18 were present.[124]

In this context we must also reiterate our recent statements about domestic violence. In *State v. Miller*, we noted "the danger that a report of *verbal* domestic dispute por-

tends."[125] We also noted a September 2005 study ranked Alaska first in the nation for the rate of intimate partner violence resulting in homicide, and that nationally 92% of female victims were murdered by someone they knew and 62% were killed by husbands, ex-husbands, or boyfriends.[126] The court of appeals itself noted in *Gallmeyer* that police intervention in domestic violence incidents is "often particularly hazardous" and courts should be "flexible in assessing the reasonableness of the particular manner chosen to deal with the emergency."[127]

■ The emergency aid exception to the warrant requirement must be viewed against that backdrop in this case. We do not mean to suggest the legislature could eviscerate Alaska's constitutional right of privacy merely by statutorily delineating police duties in specific situations. But in the domestic violence context we can say it is undisputable that the threat of injury or death affecting multiple people, including children and other family members, is a serious consideration for responding officers.

### 2. The officers' initial search was justified by the emergency aid exception to the warrant requirement.

■ Whether an officer has objectively reasonable grounds to believe an emergency exists is a question of law,[128] but the resolu-

---

120. *Id.*

121. Minutes, Sen. Judiciary Comm. Hearing on H.B. 314, 19th Leg.2d Sess. (Apr. 15, 1996) (statement of Sean Parnell, Representative, Alaska House of Representatives) ("At the request of many interested individuals and groups, the proposed committee substitute presents a more comprehensive approach to domestic violence in Alaska. The committee substitute is based, in part, on the Model Code on Domestic and Family Violence and is focused on victim protection and domestic violence prevention.").

122. Model Code on Domestic and Family Violence § 204(1) (1994).

123. *Compare* AS 18.66.990 (defining "household member" broadly, encompassing virtually all arrangements of cohabiting adults and children), *with* Model Code on Domestic and Family Violence § 102(2) (1994) (defining "family or household members" broadly, including virtually all cohabiting adults and minors).

124. Manny Rivera et al., *Assaults in Domestic Violence Incidents Reported to Alaska State Troopers*, 25 Alaska Justice Forum, Fall 2008, at 7–12.

125. 207 P.3d 541, 545 (Alaska 2009) (emphasis added).

126. *Id.* (citing Violence Policy Center, When Men Murder Women: An Analysis of 2003 Homicide Data, at 3, 5 (2005)).

127. *Gallmeyer*, 640 P.2d at 845 n. 13.

128. *See, e.g., United States v. Tovar–Rico*, 61 F.3d 1529, 1535 (11th Cir.1995) ("Our *de novo* review of the record convinces us that the agents did not reasonably believe that they were confronted with an emergency . . . ."); *cf. Beltz*, 221 P.3d at 332 (noting in context of warrantless police searches of garbage outside home whether subjective expectation of privacy is objectively reasonable is question of law).

tion of this question depends heavily on the specific facts of a given case.[129] The superior court did a commendable job establishing a record for review in the present case, conducting evidentiary hearings over five days and making detailed findings of fact, none of which are challenged by either party. We review these factual findings "in the light most favorable to upholding the trial court's ruling" to deny the motion to suppress, but "independently determine whether [its] factual findings support its legal conclusions."[130]

We take the following factual findings from the superior court's order denying the suppression motions. The officers were dispatched to Gibson's residence for "a domestic disturbance involving a knife." On arrival they heard a woman "screaming distressfully from the inside of the trailer." A woman stumbled out "naked except for a tank top [and] appeared hurried and visibly injured." She was crying "Help me, help me!" The officers "did not know how many people were involved," "had a person coming out of the trailer," and were aware of the "mention of the knife" in the dispatch, so they requested assistance.

A man "came to the doorway. The officers drew their weapons and ordered him to come out of the trailer. He complied and was placed in custody." The woman went back into the trailer to put on pants. The officers ordered her away from the trailer and tried to question her. They "observed swelling" in one eye and "a cut on the back of her head," she "was hysterical and uncooperative," when she "became argumentative" the officers were concerned "she would start a fight" with them or Gibson.

Although the woman denied anyone else was in the trailer, she continued to be uncooperative and "the officers still could not be certain about how many people were involved." The officers did not rely on the claim that no one else was in the trailer.

Both officers testified the motivation for the search was "to make sure" there were no injured people inside in need of their aid, and the superior court found the officers' testimony credible: "There was absolutely no evidence on the record that something outside the trailer led them to suspect that there could be a meth lab inside." Finally, the superior court determined the officers' search of the trailer fell "well within the time and scope limits" of an allowable search under the emergency aid doctrine. The superior court concluded the officers' initial search was justified under the emergency aid doctrine, but expressly stated it did not find "a general warrantless search exception for all domestic violence cases" and "the findings are specific to the facts of this case."

The court of appeals reversed, concluding the facts found by the superior court "would not 'have led a prudent and reasonable officer to perceive an immediate need to take action in order to prevent death or to protect against serious injury to persons or property.' "[131] The court of appeals interpreted the factual findings as follows: by the time the officers entered the trailer they knew Bevin was the victim who made the 911 call; Gibson—the apparent assailant—was in custody; and, because there was "no sign that there was anyone inside," the officers "had no reason to believe that there was anyone else in the trailer."[132] In holding the officers' belief in the existence of an emergency at the time of the search was not objectively reasonable, the court of appeals explained the test for an emergency "implies that a mere possibility that an emergency exists will ordinarily not be sufficient" and that "[t]he State justifies the police entry into Gibson's home based on speculation."[133] The court expressed concern that if it "were to authorize the police to enter someone's home based on these facts, the police would routinely be able to search a

---

**129.** *See, e.g., State v. Wood,* 210 Or.App. 126, 149 P.3d 1265, 1267–68 (2006) ("Whether an officer's perceptions of an emergency are objectively reasonable is a question of law and will depend on the facts of each case." (citing *State v. Christenson,* 181 Or.App. 345, 45 P.3d 511, 513 (2002))).

**130.** *Miller,* 207 P.3d at 543.

**131.** *Gibson,* 205 P.3d at 353 (quoting *Gallmeyer,* 640 P.2d at 842).

**132.** *Id.* at 356.

**133.** *Id.*

residence in most cases where there was a report of a serious domestic dispute."[134]

The State argues the court of appeals "failed to consider the evidence in the light most favorable" to upholding the trial court's findings when it concluded the officers' belief an emergency existed was unreasonable. The State asserts the "court of appeals mistakenly viewed the fast-moving events in isolation and failed to consider the entire scenario." The State contends the officers' belief was reasonable because of the "pandemonium" at the scene when the officers arrived and because the officers "did not know for sure who had placed the 911 call and had not seen or recovered the knife that had been used to threaten" the 911 caller.

Gibson argues the officers' belief was not objectively reasonable because: (1) the officers should have known the altercation involved only two parties given the dispatch call and their own observations when arriving; (2) "[a]ny 'pandemonium' that existed when the police first arrived had now dissipated or, at a minimum, moved out of the trailer"; (3) Bevin was obviously the victim "given her injuries and hysteria"; and (4) there was no indication anyone was in the trailer.

■■■ We agree with the State that the court of appeals did not view the superior court's factual findings in the light most favorable to upholding the denial of the suppression motion. We also believe the court of appeals took a far narrower view of an "emergency" than its own post–*Gallmeyer* cases have taken. The fundamental question raised by the difference in the superior court's and the court of appeals' decisions is this: is it enough that the police have good reason to believe *there might be*, as opposed to *there is*, someone injured in the premises? On the facts of this case, we answer yes. We therefore reverse the court of appeals' decision.

The superior court found the officers could not be certain whether Bevin and Gibson were the only persons involved in the domestic violence occurring in the trailer. The court of appeals implicitly found this finding clearly erroneous instead of considering it an accurate portrayal of the situation, concluding the officers reasonably should have known they had all the actors accounted for when Gibson and Bevin were secured.[135] Yet the superior court's finding has support in the record: the dispatch to the officers noted "a disturbance in the background" of the 911 call, and distinct voices of both the female caller and an unidentified male. The superior court found the officers reasonably declined to rely on Bevin's claim that no one else was in the trailer. Silence from the trailer for the 25 minutes the officers waited for the backup officer to arrive was as equally consistent with someone lying injured in the trailer as it was with no one being in the trailer. Taking the facts in the light most favorable to upholding the denial of the suppression motion, we conclude the officers were presented with a domestic violence emergency shrouded in ambiguity concerning the number of people involved and possibly involving serious harm to other unknown individuals. We conclude the officers had a reasonable belief someone might be lying injured in the trailer, notwithstanding that: (1) after the officers secured Gibson and Bevin, they radioed to inform the backup officer, for the public's and his own safety, that he no longer needed to respond at an emergency level; and (2) the officers waited 25 minutes for the backup officer to arrive before they conducted their search for injured persons in the trailer.

Earlier court of appeals cases considering the emergency aid doctrine are instructive.[136] For example, the court of appeals has found an officer's genuinely held belief in an emergency objectively reasonable even if no

---

134. *Id.* To be clear, this case involved not merely "a serious domestic dispute," but serious domestic *violence*—the initial 911 call included a statement about a threat with a knife and the officers observed Bevin had suffered several head wounds.

135. *Id.*

136. *See* note 100, above.

known victim existed [137] or the potential victim was believed already dead.[138] The court of appeals has upheld belief of a potential victim as reasonable when the evidence supporting that belief was second-hand [139] or third-hand information,[140] an anonymous telephone call,[141] or ambiguous personal observation.[142] Additionally, while the delay between when police received and responded to information reporting an emergency may be a factor in determining the objective reasonableness of belief in an emergency, delays in police response have not been dispositive.[143] This is true whether the delays are caused by external events [144] or police inaction.[145] These delays have extended from brief attempts to procure peaceable, rather than forcible, entry into an emergency scene [146] to multiple-hour delays.[147] The court of appeals also has afforded police wide latitude in their response or non-response to a perceived emergency: emergencies were found to exist when the police immediately called for backup,[148] when the police deliberately chose not

137. *Hotrum*, 130 P.3d at 967–68 (entry upheld where police responded to a call reporting yelling and gunshots inside home, though police neither heard anyone inside nor received any response to announcement of presence); *Mark*, 2002 WL 341979, at *1 (entry upheld where police forcibly entered hotel room after finding body of woman who had fallen from room to her death); *Larson*, 2000 WL 19199, at *1 (entry upheld where police entered home following a report of shooting to ascertain if any further victims were inside); *Krukoff*, 702 P.2d at 665–66 (discovery of double homicide with killer still at large presented emergency situation justifying search of home for known household weapons, though no expectation of finding additional victims in home).

138. *Williams*, 823 P.2d at 2–3 (emergency exception applied where defendant's confession to killing victim prompted search); *Spein*, 1984 WL 908539, at *1 (upholding entry under emergency exception after victim's brother witnessed a drunken fight between victim and her husband, heard husband threaten to kill victim, and later heard two gunshots from inside victim's home; public safety officer gained entry after 24 hours of attempts, during which victim was neither seen nor heard from).

139. *See, e.g., Spein*, 1984 WL 908539, at *1 (witness reported hearing defendant threatened to kill victim, followed by two gunshots from inside home).

140. *Williams*, 823 P.2d at 2 (killer confessed to his foster mother, who called police).

141. *Johnson*, 1998 WL 19470, at *1 (police received anonymous telephone tip about burglary on their non-emergency line).

142. *Hotrum*, 130 P.3d at 967 (when investigating call reporting yelling and gunshots inside home, police observed open doorway in middle of night and neither heard anyone inside nor received any response to announced presence); *Johnson*, 1998 WL 19470, at *1 (when investigating reported burglary, officers observed destroyed patio furniture and burning planter box and heard fight inside); *Harrison*, 860 P.2d at 1282 (when officer approached resident's house to serve mis-demeanor arrest warrant, officer saw man face down at table, apparently seriously ill or dead); *Williams*, 823 P.2d at 2 (as officer approached apartment, he saw clothing on ground outside bedroom window and several apparent blood stains on steps leading to apartment).

143. *See Williams*, 823 P.2d at 3 ("The passage of time, however, though relevant to the possible existence of an emergency, is not determinative." (citing *State v. Beaumier*, 480 A.2d 1367, 1373 (R.I.1984))); *see also Montgomery*, 1986 WL 1160968, at *1–2 (entry upheld after seven hours of negotiations); *Spein*, 1984 WL 908539, at *6 (entry upheld more than 24 hours after shots were heard).

144. *See, e.g., Williams*, 823 P.2d at 2–3 (more than six-hour delay in finding victim's apartment).

145. *Montgomery*, 1986 WL 1160968, at *1 (entry upheld despite seven-hour delay when police negotiated with apparently suicidal resident); *Spein*, 1984 WL 908539, at *6 (upheld despite more than 24–hour delay attempting to peacefully enter residence).

146. *Harrison*, 860 P.2d at 1282 (before entering home to assist apparently ill/dead individual, officer knocked on front door, tapped on window, knocked on door again, tapped on window again, opened front door and yelled in, and continuing calling to apparent victim while approaching); *Williams*, 823 P.2d at 2–3 (police stopped to knock and identify themselves, sought apartment manager for a key, and again knocked and identified before entering, despite evidence of apparent altercation and blood stains).

147. *Williams*, 823 P.2d at 2–3 (upheld despite more than six-hour delay in finding victim's apartment); *Montgomery*, 1986 WL 1160968, at *1 (seven-hour delay); *Spein*, 1984 WL 908539, at *6 (24–hour delay).

148. *Johnson*, 1998 WL 19470, at *1 (police waited until backup arrived before forcing entry into apartment).

to act out of safety concerns,[149] and when the police simply failed to request medical assistance or backup.[150]

Professor LaFave notes two relevant examples of situations in which emergency circumstances have traditionally justified warrantless entry: (1) after police learn of a shooting at a specific location from which one injured victim has been taken to the hospital, "the possibility that 'others may have been injured and may have been abandoned on the premises' provides a sufficient basis for an immediate entry 'to render aid to anyone in distress' ";[151] and (2) after police learn of a recently burglarized property, a warrantless entry is justified "to seek possible victims of violence."[152] This is consistent with the court of appeals' post–*Gallmeyer* consideration of the emergency aid doctrine until Gibson's appeal. But under the court of appeals' current view, neither example raised by Professor LaFave would support the emergency aid doctrine in Alaska because the police entries would be based on speculation.

The court of appeals' current view also has been rejected in Washington, which applies the same emergency aid doctrine standard and shares the same heightened constitutional concerns about warrantless entry into a residence.[153] In *State v. Johnson*, the police responded to a domestic violence report by a non-participant in the domestic dispute and a male came out of the residence, was handcuffed, and placed in a police car; an officer went to the door, a bloodied female answered, she was told to stay put, and the officer entered the residence "to protect [her]

and other potential victims ... and to ensure an orderly investigation."[154] The court rejected the argument that police entry should be allowed only with a "strong" belief that "a specific person" is in "actual need" of assistance.[155] The court explained this limitation "would frustrate the purpose of the emergency exception" for two reasons.[156] First, the court noted the emergency exception serves the "important purpose" of "allow[ing] police to carry out their community caretaking function to protect citizens and property."[157] Second, such a limitation "would largely defeat the purpose of the doctrine" as officers often "lack the specific information" necessary to meet this standard, such as the particular person in need or the exact number of potential victims; instead, while "[t]he officers may not know the exact nature of the need ... they know that something is amiss."[158]

We believe the Washington courts, Professor LaFave, and the court of appeals' earlier considerations of the *Mitchell/Gallmeyer* standards reflect the appropriate application of the emergency aid doctrine in this case. It is important to contrast the facts of this case with the hypothetical fact pattern the court of appeals presumably was concerned about when reversing the trial court's suppression ruling: this is not a case of an anonymous third-person report of a verbal domestic dispute uncorroborated by any auditory or visual evidence upon the officers' arrival. That fact pattern is not before us and we express no view on the application of the emergency aid doctrine to that fact pattern.[159]

**149.** *Montgomery*, 1986 WL 1160968, at *1 (police did not enter immediately, instead engaged in negotiations with apparently suicidal resident for seven hours).

**150.** *Harrison*, 860 P.2d at 1282 (officer did not call for ambulance, police backup, or other medical back up despite apparently seriously ill or dead individual).

**151.** LaFave, note 97, above, § 6.6(a), at 457 (quoting *People v. Hill*, 12 Cal.3d 731, 117 Cal. Rptr. 393, 528 P.2d 1, 19–20 (1974)).

**152.** *Id.* at 461, 117 Cal.Rptr. 393, 528 P.2d 1.

**153.** *See State v. Johnson*, 104 Wash.App. 409, 16 P.3d 680 (2001).

**154.** *Id.* at 682.

**155.** *Id.* at 684–85.

**156.** *Id.* at 685.

**157.** *Id.*

**158.** *Id.*

**159.** *Cf. State v. Menz*, 75 Wash.App. 351, 880 P.2d 48, 49–50 (1994) (holding warrantless entry lawful under emergency aid doctrine when responding to an anonymous report of domestic violence despite not observing any signs of violence at scene, because "a reasonable person facing this combination of circumstances would

What we do express is that where: (1) the police respond to a domestic violence call and find serious domestic violence has occurred; and (2) it is unclear whether the police have accounted for everyone, especially children, who may have caused or been affected by the serious domestic violence, the police may have a reasonable belief that some unknown person(s) might be lying injured and enter the premises to search for possible victims. Given the factual findings made by the trial court in this case, and given our directive that those facts be viewed in the light most favorable to upholding the trial court's suppression decision, we must reverse the court of appeals' decision that the police did not have a reasonable belief of an emergency justifying a warrantless entry into Gibson's trailer.

## V. CONCLUSION

We REVERSE the court of appeals' decision that the emergency aid doctrine is inapplicable because the officers did not have an objectively reasonable belief of an emergency justifying the initial warrantless entry into Gibson's residence. Because the court of appeals stopped its consideration of Gibson's appeal at this first prong of the emergency aid doctrine, we remand to the court of appeals for consideration of the remainder of Gibson's issues on appeal in light of our decision.[160]

CHRISTEN, Justice, dissenting.

CHRISTEN, Justice, dissenting in part.

I agree with the court's articulation of the *Gallmeyer* test as the correct standard for the warrantless entry of a private residence under the emergency aid exception, but I agree with the court of appeals that the first prong of the test was not met here. In

Alaska, it is necessary for police officers to base the suspicion that an emergency exists on objectively reasonable facts. *Gallmeyer* requires more than pure speculation that an emergency could be ongoing.[1] Despite its lengthy review of fact patterns from other cases that justified warrantless searches— where babies were obviously at risk or where citizens had been injured or were clearly in peril—the bottom line in this case is that no objective facts provided grounds for the warrantless entry. None are cited by the court.

In my view, the court of appeals was disciplined in its application of *Gallmeyer* and correctly concluded that if a warrantless search could be upheld under the circumstances of this case, then a warrantless search could be permitted in virtually all domestic disturbance 911 calls. The Alaska Constitution requires more. Because the decision issued today allows the emergency aid exception to swallow the rule that warrantless entries of private homes are not permitted in Alaska, I respectfully dissent.

---

have thought that someone inside needed assistance").

**160.** In his appeal to the court of appeals, Gibson also challenged the second and third searches of the trailer, conducted by Officer Asselin and Detective Bryant, respectively, as part of his claim that the superior court should have granted his motion to suppress, dismissed the indictment, and reversed his conviction. These issues remain for the court of appeals to address on remand.

**1.** *Gallmeyer v. State,* 640 P.2d 837, 842 (Alaska App.1982) ("[I]t is well settled that the existence of an emergency must be determined by an objective standard—whether the evidence would have led a prudent and reasonable officer to perceive an immediate need to take action in order to prevent death or to protect against serious injury to persons or property.").